KRISTI L.M., J.K.M. and J.M.,
Petitioners-Respondents,

v.

DENNIS E.M., Respondent-Appellant-Petitioner.

Supreme Court

*No. 2005AP1034. Oral argument April 11, 2007.
—Decided July 3, 2007.*

2007 WI 85

(Also reported in 734 N.W.2d 375.)

For the respondent-appellant-petitioner there were briefs by *Brian A. Pfitzinger* and *Elbert & Pfitzinger, Ltd.*, Juneau, and oral argument by *Brian A. Pfitzinger*.

For the petitioners-respondents there was a brief by *Kenneth R. Sipsma, Erika L. Bierma,* and *Sipsma, Hahn & Brophy, L.L.C.*, Madison, and oral argument by *Kenneth R. Sipsma*.

An amicus curiae brief was filed by *Zev D. Kianovsky,* assistant corporation counsel, on behalf of Dodge County Corporation Counsel.

¶ 1. LOUIS B. BUTLER, JR., J.  Dennis E.M. seeks review of an unpublished summary disposition order of the court of appeals[1] affirming a circuit court order that imposed a child abuse injunction against Dennis, restricting his contact with his two children, J.K.M. and J.M. The injunction was imposed after Dennis's wife, Kristi[2] L.M., filed a petition alleging that she found bruises on the head of the couple's 11–month-old boy, J.K.M., after the child's visitation with Dennis. Kristi also alleged Dennis had made numerous statements suggesting he posed a threat to the safety of Kristi, the children and himself.

---

[1] *Kristie L.M. v. Dennis E.M.*, No. 2005AP1034, unpublished order (Wis. Ct. App. September 14, 2006).

[2] The petitioner-respondent's name is spelled incorrectly in the case caption. The record indicates the petitioner-respondent's first name is "Kristi." We use the correct spelling in this opinion, and we direct the Clerk of the Supreme Court to amend the caption accordingly.

¶ 2. Following a hearing, the Dodge County Circuit Court, Honorable Richard Callaway, Reserve Judge, ordered the injunction pursuant to Wis. Stat. § 813.122(5)(a)3. (2005–06).[3] Dennis appealed the decision, arguing that the circuit court erroneously exercised its discretion in granting the injunction. The court of appeals issued a summary order, reversing the circuit court's decision as to J.M. and affirming its decision as to J.K.M.[4] Dennis sought review of the court of appeals' order affirming the injunction as to J.K.M.

¶ 3. We conclude that the circuit court acted within its discretion in issuing the injunction as to J.K.M. because Dennis's prior conduct, including the bruising of J.K.M., gave the circuit court reasonable grounds to believe that Dennis engaged in abuse and may engage in abuse of J.K.M. We therefore affirm the summary order of the court of appeals.

I

¶ 4. On December 13, 2004, Dennis E.M. and Kristi L.M. separated after six years of marriage. Dennis filed a petition for divorce on February 28, 2005. The couple had two minor children, J.K.M., born April 14, 2004, and J.M., born February 8, 2002. A temporary order in the divorce proceeding directed that Dennis was to have the children Monday through Friday from 7:30 a.m. to 1:00 p.m., unless he was off work, in which case placement would be from 7:30 a.m. until 5:00 p.m.

---

[3] All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

[4] Kristi L.M. did not seek cross-review of the court of appeals' reversal of the circuit court's injunction as to J.M. We therefore do not address the court of appeals' order as it concerns J.M.

Dennis also had visitation for one overnight per week and for one four-hour period of time each weekend.

¶ 5. On April 4, 2005, Kristi filed a petition for a temporary child abuse restraining order pursuant to Wis. Stat. § 813.122 alleging Dennis had inflicted physical injury on J.K.M. and had caused emotional damage to J.M. In a statement in support of the petition, Kristi averred she found bruises on J.K.M's head "consistent with fingerprints" after J.K.M. returned from a visitation with Dennis. Kristi alleged that Dennis had a "long history of mental illness." She stated that Dennis had called in December 2004 to tell her that he "had made his final goodbyes to the children and told me he wasn't coming home after work and I wouldn't see him again." She averred Dennis called her in February 2005 to tell her he was going to spend the day at the cemetery. Kristi stated she did not believe the children were safe in Dennis's care.

¶ 6. On April 8, 2005, the circuit court held a hearing on the motion. Kristi gave testimony about several incidents involving Dennis. She recounted a conversation she had with Dennis one night in early January 2005 when he called her on his way home from work:

> KRISTI: He asked me if I read the article in the newspaper about what happened in Montello and I said I was not aware of it, what happened? And he said that there was a man who was served divorce papers by his wife, took himself and his 17–month-old son and killed him and himself. He became very quiet—
>
> ATTORNEY: Was he—who's "he" now?
>
> KRISTI: Dennis. He became very quiet, started crying and said [he could] relate to that.

¶ 7.   Kristi also testified about a conversation she had with her three-year-old son, J.M.:

> KRISTI:   [J.M.] said, mommy, can we talk and I said yeah. . . . So I sat down next to him on the step and he said we're going to die and I said, [J.M.], who said that to you and who told you that and he didn't say anything. And I asked him again, [J.M.], who told you that and he said daddy. And I said, well, what else did daddy say and he said words and I told him that, um, it was okay to say what daddy said and then he said mommy's a bitch and I asked him if it was just mommy that was going to die. He said, no, mommy, [J.M.], [J.K.M.] and daddy.

¶ 8.   Kristi testified that Dennis told her that one day in November 2004, he "was downstairs doing laundry and thought about hanging himself" while he was supervising the children. She said that in June 2000 Dennis "was very depressed and threatened to take an overdose of pills." She said that since she and Dennis had separated in December 2004, Dennis had tried "several times" to get himself "emergency detained."

¶ 9.   In his testimony, Dennis admitted to having a history of emotional problems and depression, but disputed most of Kristi's allegations. Dennis denied telling Kristi that he thought about hanging himself while the children were in his care, and denied telling Kristi he was going to spend the day at the cemetery. He denied telling J.M. that they were all going to die. He admitted mentioning to Kristi the story of the Montello man who had killed himself and his son, but "just to see if [Kristi] had heard about it." He stated he told Kristi he'd said goodbye to the children and wasn't coming home because he was angry about a large fuel bill. Dennis said he'd talked about having himself "emer-

gency detained" in a hospital, but his therapist at the time didn't think it was necessary.

¶ 10. Kristi also testified about an incident that occurred on March 25, 2005, while Dennis was supervising the children at his home. She said Dennis called her to say that J.K.M. had hit his head on the entertainment center. After J.K.M. was returned to Kristi's care later that day, she noticed swelling and a "fairly long mark" on the left side of the infant's head, a laceration on his forehead, a red mark on his chin, and redness on his knees and tops of his feet. Kristi discovered bruises three days later when "the swelling had gone down and you could see that there were three distinct marks on the side of his head that were round like a fingerprint." Kristi then took J.K.M. to the police department, where she was directed to take him to the hospital.

¶ 11. Dr. Halim Hennes treated J.K.M. in the emergency room at Children's Hospital in Milwaukee, and testified about his examination of J.K.M. Dr. Hennes said he discovered two circular bruises on the side of J.K.M.'s head. He ordered a head CT (computed tomography) scan, the results of which were normal, and a skeletal survey, which showed no evidence of fractures. When asked to give his opinion as to the medical probability that the bruises were caused by child abuse, Dr. Hennes replied, "very minimal." Dr. Hennes later added that he "did not rule . . . out" child abuse as the cause of the bruises, but said its "likelihood" as the reason for the bruises "is small."

¶ 12. Dr. Virginia Greenbaum, Medical Director at the Child Protection Center at Children's Hospital of Wisconsin, testified about her examination of police photographs of J.K.M.'s bruises and relevant medical records. Dr. Greenbaum said the photographs showed

three bruises on the left portion of J.K.M's scalp and a bruise on the right side of his forehead. She testified that the bruises were consistent with markings caused by fingers or knuckles pressing on the child's skull. Dr. Greenbaum testified the bruises were suspicious for abuse for several reasons:

> A child who is not too mobile, who is a pre-cruiser, typically has no bruises at all . . . they can't get themselves into trouble, can't generate that much force and can't move fast. Once in a while you see one bruise or perhaps two but to see four . . . is somewhat unusual and it's very unusual to see them clustered in one area over the scalp with absolutely no explanation from the caretaker.
>
> . . . .
>
> I asked the mother about [J.K.M. falling against] the entertainment center. . . . I would expect that the child is – would have to either be crawling into it or standing and then fall and bump against it, either, which it's a very minor trauma, very low velocity. At most, I would expect to see a single bruise, probably on the forehead. . . . Certainly you wouldn't expect to see a cluster of three individual bruises. . . .

Dr. Greenbaum testified that, based on her training and experience, she suspected the bruises were caused by abuse. However, she said she could not determine who caused the bruises, nor could she say whether the bruises occurred at the same time.

¶ 13.   Dennis denied grabbing J.K.M. by the head, and stated that he believed his hands were too small to fit around J.K.M.'s head to cause the child's bruises. He testified that J.K.M. received the bruises by falling and striking his head on the door of the entertainment center while reaching for some toy blocks.

¶ 14.  Dr. Michael Haight, a psychologist Dennis had been seeing for about four months, also testified at the hearing. He stated Dennis had been diagnosed with major depressive disorder and had been hospitalized in 2000 or 2001. He reported that Dennis was still somewhat depressed but had improved since January 2005. Dr. Haight said Dennis told him that he was taking his medication. He said Dennis had reported that he had been suicidal at one time in the past, but that he did not believe Dennis was now a suicide risk, and that Dennis had given no indication he would be a danger or threat to his children. Dr. Haight testified that "there would be greater potential" for Dennis to be a threat to his own safety and that of others "if he were not on his medication."

¶ 15.  When Dennis was asked if he was taking his medication, he said that he had been taking it regularly since the middle of December. He said that prior to the middle of December, "I did take it sporadically. If I'd feel good, I'd take myself off the medicine." When asked if he might take himself off his medication again in the future, he responded, "I can't answer that."

¶ 16.  Judge Callaway granted the motion for an injunction at the conclusion of the hearing, stating his reasons as follows:

> I'm very concerned about the fact that a psychologist will say, when I asked him the question that if he would not take his medication, that, yes, [failure to take the medication] . . . could result in a—a problem for the children.
>
>     . . . .
>
> If [a person prescribed medication is] on the medication, it seems to keep them very, very calm and less likely to [cause problems].

194

. . . .

But I am concerned about the fact that we have a[n] 11–month-old child who ends up with some bruises; that they're—they're really not consistent with hitting your head against something. They're—it's an unusual marking. And that's sort of scary. . . . I agree with the guardian ad litem in this case: It's a very close call.

. . . .

[T]here are reasonable grounds to believe that [Dennis] has engaged in, or threatened to engage in, abuse to the child. That abuse can mean mentally as well as physically and I'm afraid, under the circumstances, we might have both.

. . . .

I'm concerned about the cumulative aspect of the evidence. I see no reason why [Dennis] would call his wife and ask her if—have you heard about the fellow in Montello that killed his child and himself. There's no reason to bring that up. It may be of interest in an—in the newspaper but not to call her and ask her about it. The doctor, his own psychologist, indicated that he was suicidal at one time. That he also testified that if he refused to take his medication he could be—could cause danger to himself or to others. That's pretty important.

¶ 17. Judge Callaway granted the motion for an injunction as to both children. On April 8, 2005, he signed an injunction form, marking boxes that ordered Dennis to "avoid the child[ren]'s residence and/or any premises temporarily occupied by the child[ren] now and in the future" and "avoid contacting or causing any person other than a party's attorney to contact the child[ren] unless [Kristi] consents in writing and the court agrees the contact is in the best interest of the child[ren]." In an attachment to the injunction, Judge

Callaway ordered that Dennis's visitation with the children be limited to "supervised visitation at times agreed to by [the guardian ad litem]."

¶ 18. On April 15, 2005, Dennis filed a notice of appeal. The court of appeals disposed of the appeal by a summary disposition order dated September 14, 2006. *Kristie L.M. v. Dennis E.M.*, No. 2005AP1034, unpublished order (Wis. Ct. App. September 14, 2006). The court of appeals concluded that the circuit court acted within its discretion in granting the injunction as to J.K.M because the bruises to J.K.M.'s head were either "severe" bruises or a nonenumerated "physical injury" under Wis. Stat. § 48.02(14g)[5] constituting "abuse" within the meaning of the child abuse restraining orders and injunctions statute. *Kristie L.M.*, No. 2005AP1034, unpublished order, pp. 3–4. As to J.M., however, the court of appeals concluded the circuit court erroneously exercised its discretion by issuing the injunction because no evidence was presented to show that J.M. suffered "abuse" within the meaning of Wis. Stat. § 813.122(5)(a)3., as demonstrated by either "physical injury" (not alleged in J.M's case) or "emotional damage," *see* Wis. Stat. § 48.02(14g) and (1)(gm). *Id.*, pp. 5–7.

¶ 19. Judge Charles P. Dykman dissented from the court of appeals' summary disposition order as to J.K.M. on grounds that J.K.M.'s bruises were not "severe" within the meaning of § 48.02(14g) and therefore reasonable grounds did not exist to issue the injunction.

---

[5] It is unclear from the summary order whether the court of appeals believed that the bruises to J.K.M. constituted "physical injury" because they were "severe" bruises, or whether they fell under the "not limited to" catch-all under Wis. Stat. § 48.02(14g). *See Kristie L.M.*, No. 2005AP1034, unpublished order, p. 3.

*Kristie L.M.*, No. 2005AP1034, unpublished order, pp. 7–8 (Dykman, J. dissenting). Judge Dykman also noted that a child abuse injunction creates a rebuttable presumption in child custody proceedings that joint legal custody is not in the best interest of the child under Wis. Stat. § 767.24(2)(b)2.c. (2003–04),[6] and expressed a concern that "some child abuse injunctions and domestic abuse injunctions are brought on questionable evidence as precursors to divorce actions, for the sole purpose of insuring a favorable legal custody judgment." *Id.*, p. 8.

¶ 20. Dennis filed a petition asking this court to review the court of appeals' order affirming the circuit court's order of an injunction to determine whether the injunction infringed upon his constitutional right to have a relationship with his child.[7] We granted review. We subsequently granted a motion of the Dodge County

---

[6] Wisconsin Stat. § 767.24(2)(b)2.c. was renumbered to Wis. Stat. § 767.41(2)(b)2.c. by 2005 Wis. Act 443.

[7] Dennis casts the issue presented in this case in constitutional terms, but fails to develop the constitutional arguments in his appeal. We note that a petition for an injunction under Wis. Stat. § 813.122 enjoining a parent from having contact with the parent's child, like a judicial proceeding for termination of parental rights (TPR), implicates the fundamental rights of the parent. *See T.M.F. v. Children's Serv. Soc'y of Wis.*, 112 Wis. 2d 180, 184–85, 332 N.W.2d 293 (1983) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment.")). Unlike a TPR proceeding, the degree to which these rights are implicated may vary from case to case, depending upon the duration and terms of the injunction. We do not address further the constitutional issues involved in this review. *See Clean Wisconsin, Inc. v. Pub. Serv. Comm'n*, 2005 WI 93, ¶ 180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 (undeveloped arguments need not be addressed).

Corporation Counsel to file an amicus brief, which has been received. We now affirm.

## II

¶ 21. This is the first time that this court has reviewed an order granting a motion for an injunction under the child abuse restraining order and injunctions statute, Wis. Stat. § 813.122, to determine whether reasonable grounds existed to issue the injunction.[8] The question of whether a court or circuit court commissioner may grant such an injunction is addressed to the discretion of the court or circuit court commissioner that hears the petition. *See M.Q. v. Z.Q.,* 152 Wis. 2d 701, 708, 449 N.W.2d 75 (Ct. App. 1989). However, an injunction may not issue unless the judge finds reasonable grounds to believe that the respondent has engaged in or may engage in abuse of the child victim. *Id.*

¶ 22. We review the question of whether such reasonable grounds exist in two parts. *See id.* First, we will affirm the court or circuit court commissioner's findings of fact unless they are clearly erroneous. *Id.* Second, we review de novo the court or circuit court commissioner's conclusion of law as to whether, based on the facts of record, reasonable grounds existed to grant the injunction. *See id.* We may independently review the record to determine whether sufficient evi-

---

[8] Wisconsin Stat. § 813.122(5)(a) was cited in another case before this court in *State v. O'Dell,* 193 Wis. 2d 333, 343–44, 532 N.W.2d 741 (1995), which concerned the effect of a circuit court judge's oral statements on the terms of a written injunction under Wis. Stat. § 813.122(5)(a). However, the substantive provisions of § 813.122 were not addressed in *O'Dell.*

dentiary grounds exist to sustain the court or circuit court commissioner's exercise of discretion. *See State v. Dumler,* 2003 WI 62, ¶ 11, 262 Wis. 2d 292, 664 N.W.2d 525.

### III

¶ 23. The child abuse restraining orders and injunctions statute, Wis. Stat. § 813.122, provides that a child victim, or a parent, stepparent or legal guardian of the child victim, may initiate an action for an injunction restricting a party's contact with a child by filing a petition with a court or circuit court commissioner. § 813.122(2) and (6)(a). A judge may grant the injunction "if . . . [a]fter [a] hearing, the judge finds reasonable grounds to believe that the respondent has engaged in, or based upon prior conduct of the child victim and the respondent may engage in, abuse of the child victim." § 813.122(5)(a)3.[9]

¶ 24. For purposes of Wis. Stat. § 813.122, the word "abuse" has the meaning given in the Children's Code, Chapter 48 of the Wisconsin Statutes. Wis. Stat.

---

[9] Wisconsin Stat. § 813.122(5)(a) provides, in full:

A judge may grant an injunction ordering the respondent to avoid the child victim's residence or any premises temporarily occupied by the child victim or both, and to avoid contacting or causing any person other than a party's attorney to contact the child victim unless the petitioner consents to that contact in writing and the judge agrees that the contact is in the best interests of the child victim, if all of the following occur:

1. The petitioner files a petition alleging the elements set forth under sub. (6)(a).

2. The petitioner serves upon the respondent a copy of the petition and notice of the time for hearing on the issuance of the injunction, or the respondent serves upon the petitioner notice of the time for hearing on the issuance of the injunction.

§ 813.122(1)(a). "Abuse" as defined by Wis. Stat. § 48.02(1)(a) includes "[p]hysical injury inflicted on a child by other than accidental means."[10] Chapter 48 defines "physical injury" as "includ[ing] but . . . not limited to lacerations, fractured bones, burns, internal injuries, severe or frequent bruising or great bodily harm, as defined in s. 939.22(14)." § 48.02(14g). The Children's Code contains a statement of legislative purpose which directs that Chapter 48 "shall be liberally construed to effectuate the following express legislative purposes," which include "[t]o recognize that children have certain basic needs which must be provided for, including . . . the need to be free from physical . . . injury." Wis. Stat. § 48.01(1)(ag).

¶ 25. Dennis contends that reasonable grounds did not exist to support the circuit court's order granting the motion for an injunction because the bruises on J.K.M.'s head were not, as a matter of law, "severe bruis[es]" constituting "abuse" under Wis. Stat. § 48.02(1) and (14g). Dennis argues the court of appeals, in affirming the circuit court's injunction, erroneously construed "severe bruising" to include any bruise, no matter its severity.

¶ 26. Kristi responds that the circuit court properly exercised its discretion because the bruises were "severe," constituting abuse under Wis. Stat. § 48.02(1) and (14g), taking into account that the bruises were to the child's head, the child's age and vulnerability, and

---

3. After hearing, the judge finds reasonable grounds to believe that the respondent has engaged in, or based upon prior conduct of the child victim and the respondent may engage in, abuse of the child victim.

[10] Other forms of abuse defined in Wis. Stat. § 48.02(1)(a)-(gm) are not pertinent to this matter and will not be described here.

the manner in which the bruises were caused. Likewise, amicus Dodge County Corporation Counsel contends that the question of whether a bruise is "severe" for purposes of the child abuse injunction statute should not be limited to the appearance of the bruise, but may include the location of the bruising, the child's stage of development, and the means by which the alleged abuser caused the bruise.

■

¶ 27.  We conclude that the record demonstrates that reasonable grounds existed to justify the circuit court's exercise of discretion in granting the injunction as to J.K.M. on its reasonable belief that Dennis either engaged in abuse or may engage in abuse of J.K.M. based on Dennis's prior conduct, including but not limited to the severity of J.K.M.'s bruising.

¶ 28.  Our analysis of the circuit court's decision begins with the court's factual findings and credibility determinations. *See M.Q.,* 152 Wis. 2d at 708. Judge Callaway's oral ruling indicates he found Kristi to be a more credible witness than Dennis. The judge disbelieved Dennis's testimony that he called Kristi about the murder-suicide in Montello "just to see if [Kristi] had heard about it." The judge concluded:  "I see no reason why [Dennis] would call his wife and ask her if—have you heard about the fellow in Montello that killed his child and himself. There's no reason to bring that up."

¶ 29.  The judge was skeptical of Dennis's explanation for the cause of J.K.M.'s bruises, stating that the bruises were "really not consistent with hitting your head against something." This statement also indicates the judge believed Dr. Greenbaum's testimony about the suspicious nature of the bruising and gave her testimony significant weight. *See Adams Outdoor Ad-*

*vertising, Ltd. v. City of Madison,* 2006 WI 104, ¶ 27, 294 Wis. 2d 441, 717 N.W.2d 803 ("The weight and credibility to be given to the opinions of expert witnesses is 'uniquely within the province of the fact finder.' ") (citation omitted). Dr. Greenbaum testified that the bruises to J.K.M.'s head were suspicious for abuse because they were inconsistent with the bruising one would normally see on an 11–month–old child. She noted that a child of that age is a "pre-cruiser" who

> can't get themselves into trouble, can't generate that much force and can't move fast. Once in a while you see one bruise or perhaps two but to see four . . . is somewhat unusual and it's very unusual to see them clustered in one area over the scalp with absolutely no explanation from the caretaker.
>
> I asked the mother about [J.K.M. falling against] the entertainment center. . . . I would expect that the child is – would have to either be crawling into it or standing and then fall and bump against it, either, which it's a very minor trauma, very low velocity. At most, I would expect to see a single bruise, probably on the forehead. . . . Certainly you wouldn't expect to see a cluster of three individual bruises. . . .

Dr. Greenbaum testified that the bruises were consistent with markings caused by fingers or knuckles pressing on the child's skull.

¶ 30. We must determine whether, on these factual findings and credibility determinations of the circuit court, reasonable grounds exist to conclude that the bruises to J.K.M. were "severe" constituting abuse within the meaning of Wis. Stat. § 48.02(1) and (14g). We note that the photographic evidence contained in the record (the same photographs upon which Dr. Greenbaum based her opinion) does not show a high degree of discoloration or other visual indicators that

the bruising was "severe." We therefore conclude that the appearance of the bruising alone does not provide a sufficient basis on which to conclude that the bruising was "severe" constituting "abuse" within the meaning of the relevant statutes.

¶ 31. Nevertheless, Kristi and amicus contend that the circumstances surrounding the bruise are also relevant to whether bruising may be "severe" for purposes of the child abuse injunction statute. The meaning and scope of the phrase "severe bruising" is a matter of statutory interpretation subject to our independent review. *Landwehr v. Landwehr*, 2006 WI 64, ¶ 9, 291 Wis. 2d 49, 715 N.W.2d 180.

¶ 32. Bruising is the only category of injury enumerated in Wis. Stat. § 48.02(14g) that must be "severe" or "frequent" to constitute abuse. *See* § 48.02(14g). The Children's Code does not define what may constitute "severe bruising."

¶ 33. We conclude that an interpretation of "severe bruising" that includes consideration of the circumstances surrounding the physical injury is reasonable and is consistent with the legislature's directive to "liberally construe" Chapter 48 to effectuate its legislative purposes, which include "recogniz[ing] that children have [a] . . . basic need to be free from physical . . . injury." Wis. Stat. § 48.01(1)(ag).

¶ 34. We further conclude on the factual findings of the circuit court that J.K.M.'s bruises were "severe" based on the combination of the following factors: (1) the sensitive location of the bruising, on the child's skull; (2) the vulnerability of a child of J.K.M.'s age; and (3) the means by which the court determined the

bruises were created, by an adult hand pressing on the child's skull. Accordingly, we conclude that the bruising to J.K.M.'s head was "severe bruising" constituting "abuse" within the meaning of Wis. Stat. § 48.02(1) and (14g) and providing reasonable grounds for the circuit court's injunction order.

■

¶ 35. In addition to the evidence of bruising, Judge Callaway explained that he was also "concerned about the cumulative aspect of the evidence." We agree that the "cumulative aspect" of a variety of evidence regarding Dennis's past conduct provides reasonable grounds to conclude that Dennis may engage in abuse of J.K.M. Dennis admitted calling to tell Kristi about the Montello man who killed himself and his son. As noted, the circuit court found incredible Dennis's testimony that he called just to find out if she had heard about the story. Kristi's testimony indicated Dennis became "very quiet" when he told her about it and that he "started crying."

¶ 36. Dr. Haight, Dennis's psychologist, testified about Dennis's past struggles with suicidal thoughts and the increased risk of harm Dennis would pose to himself and others if he were to go off of his medication. Dennis testified that, before December 2004, he took his medication only "sporadically," and that he would "take [himself] off the medicine" if he started to "feel good." Significantly, Dennis told the court he "[couldn't] answer" whether he might take himself off his medication again in the future.[11]

---

[11] The fact that Dennis has been prescribed medication is not relevant to whether reasonable grounds exist for a child abuse injunction. Many persons are prescribed medication to address mental health issues, and this reality has no bearing on

¶ 37. Kristi testified that J.M. said Dennis had told him that the entire family was "going to die." Kristi also testified that Dennis said he considered hanging himself in the basement laundry while he was supervising J.M. and J.K.M.

¶ 38. Dennis denied that these events occurred, and Judge Callaway did not make explicit findings with regard to these allegations. However, some of Judge Callaway's explicit findings indicate that he found Kristi to be a more credible witness than Dennis. Kristi's testimony regarding these matters therefore supports the circuit court's exercise of discretion, although we ascribe less significance to this testimony than to the court's explicit findings. *See State v. Davidson,* 2000 WI 91, ¶ 53, 236 Wis. 2d 537, 613 N.W.2d 606 (an appellate court may independently review the record to ascertain a reasonable basis for a trial court's discretionary decision).

¶ 39. We agree with Judge Callaway's observation that this is a close case. And although no such allegation has been made in this case, we share Judge Dykman's concerns about child abuse injunctions being brought on questionable evidence to gain an advantage in subsequent custody proceedings. However, we conclude that the evidence as found by the circuit court in this case provided a sufficient basis to grant the motion for an injunction on the grounds that Dennis engaged in abuse and may engage in abuse of J.K.M. under Wis.

---

whether they are a threat to engage in abuse of their children. What is relevant to the grounds for an injunction in this case is Dennis's demonstrated history of "taking himself off" of prescribed medication; his near admission that he might do so in the future; and expert testimony of his psychologist that, without the medication, he would be more likely to harm himself and others.

Stat. § 813.122(5)(a)3. We therefore affirm the circuit court's injunction order as a proper exercise of its discretion.

## IV

¶ 40.   In summary, we conclude that the circuit court acted within its discretion in issuing the injunction as to J.K.M. because Dennis's prior conduct, including the bruising of J.K.M., gave the circuit court reasonable grounds to believe that Dennis engaged in abuse and may engage in abuse of J.K.M. We therefore affirm the summary order of the court of appeals.

*By the Court.*—The decision of the Court of Appeals is affirmed.