STATE of Wisconsin, Plaintiff-Respondent,

v.

William Troy FORD,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2006AP806–CR. Oral Argument November 1, 2007.
—Decided December 11, 2007*

2007 WI 138

(Also reported in 742 N.W.2d 61.)

1

3

For the defendant-appellant-petitioner there were briefs filed by *Ralph J. Sczygelski,* and *Sczygelski Law Firm, LLC,* Manitowoc, and oral argument by *Ralph J. Sczygelski.*

For the plaintiff-respondent the cause was argued by *Rebecca Rapp St. John,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. ANN WALSH BRADLEY, J. The petitioner, William Troy Ford, seeks review of an unpublished court of appeals decision affirming a judgment convicting him of battery, bail jumping, and conspiracy to bribe a witness, all as a repeater.[1] Ford maintains the circuit court erroneously exercised its discretion when it de-

---

[1] *See State v. Ford,* No. 2006AP806–CR, unpublished slip opinion (Wis. Ct. App. December 12, 2006) (affirming a judgment of the circuit court for Ashland County, Robert E. Eaton, Judge).

nied his motion for a mistrial. He contends that he is entitled to an automatic reversal of his convictions because the bailiff's contact with the victim of the crime made the bailiff a potential witness and tainted the jury deliberations. He further asserts that the circuit court erred in allowing witnesses to testify regarding the contents of a surveillance videotape.

¶ 2. We determine that the bailiff's contact with the crime victim is not structural error and does not require automatic reversal. Further, the circuit court's determination that the alleged error was not sufficiently prejudicial to warrant a mistrial was within its discretion. Therefore, the circuit court's decision to deny Ford's motion for mistrial was not an erroneous exercise of its discretion.

¶ 3. In addition, we determine that because the surveillance tape was unplayable, and the State made reasonable efforts to restore it to playability, the circuit court did not err in concluding that the tape was destroyed within the meaning of Wis. Stat. § 910.04(1). We therefore determine that the circuit court did not erroneously exercise its discretion in admitting testimony regarding the contents of the tape. Accordingly, we affirm the court of appeals.

I

¶ 4. In August 2004, at about one o'clock in the morning, Ford and a female companion entered an Ashland convenience store. The female came to the counter to pay for some items. As the store clerk was tending to the companion, Ford came up behind the clerk and struck him in the head with a glass bottle. Ford next struck the clerk several times in the face with his hands.

6

¶ 5. At trial the clerk testified that Ford then picked up a stapler, shook it at him, and demanded that he give Ford his car. When the clerk refused, Ford joined his companion at the counter and suggested that the clerk pay for her merchandise. Again, the clerk refused. The companion paid for her items. Ford then apologized for his conduct and asked the clerk if he was going to call the police. When the clerk responded that he did not intend to call them, Ford and his companion left.

¶ 6. About two hours later a regular customer, Larry Wolfgram, came to the convenience store during his shift as a cab driver. When Wolfgram heard about the incident he recommended that the clerk call the police and the store manager, and the clerk did so.

¶ 7. Wolfgram left the store for a drive, but he returned a while later. When he returned, police officers were present at the store. One officer was looking for the phone number for the store. Wolfgram retrieved the number from a phonebook, wrote it down, and handed it to the officer. Wolfgram left without speaking to the officer.

## A. The Bailiff

¶ 8. During direct examination of the clerk on the first day of trial, the prosecuting attorney asked the clerk why he did not call the police immediately after the incident. The clerk stated that he simply kept working because he needed the money and that the blows he received affected his perceptions. He explained that he decided to call the police after it was recommended that he do so. Both the State and the defense were under the impression that the clerk called the police after speaking with his manager. When the prosecuting attorney asked if it was his manager who

made the recommendation, the clerk responded by pointing to the bailiff. Wolfgram was serving as a bailiff at the trial. The court interceded, attempting to clarify the situation:

The Court: Just for the record, are you pointing to the bailiff, Mr. Wolfgram?

A: Yes, I am.

¶ 9. At the conclusion of the clerk's direct examination, the court took a recess. It had another person act as bailiff and instructed Wolfgram "not to have any contact with the jurors in the case."

¶ 10. After the break, the court examined Wolfgram's role in the case. It established that Wolfgram had not discussed the matter with the jurors. Wolfgram stated that he did not realize until the morning of the trial that the case for which he was serving as bailiff concerned the incident at the convenience store. He stated that he had not said anything because his contact with the case had been so limited and seemingly irrelevant.

¶ 11. Ford moved for a mistrial, arguing that Wolfgram could be an important defense witness if the clerk did not mention anything about an attempted armed robbery. Additionally, he argued that the jury could have been improperly influenced because the jurors "would likely want to know" what the bailiff "might have to say about the case."

¶ 12. The circuit court denied the motion. It stated that there was no indication that Wolfgram had any improper contact with the jury or had said anything to the jury regarding the incident. Further, the court determined that there was not even an appearance of impropriety because Wolfgram was not a witness for the State and only a potential witness for the defense.

8

¶ 13. The court explained that it did not "consider him a critical witness or even a material witness, [rather] we have somebody who is potentially the hundredth person that [the clerk] talked to that day after the alleged events." Thus, based on Wisconsin case law,[2] the court concluded that it had no basis for declaring a mistrial because it did not "have a basis for concluding that the parties can't receive a fair trial in this case."

¶ 14. Nonetheless, the court replaced Wolfgram with a different bailiff. As a precaution in case Ford wished to call Wolfgram as a witness, the court excluded Wolfgram from the trial and instructed him not to discuss the case with witnesses. In addition, it questioned the jury as to whether any members knew Wolfgram and whether they could be fair and impartial. One juror stated that Wolfgram was a cousin of one of her relatives by marriage, but that she could decide the case fairly and impartially. No other jurors responded when asked if they knew Wolfgram, and no jurors indicated that their contact with Wolfgram as bailiff would keep them from acting fairly and impartially in the case.

¶ 15. Cross-examination of the clerk continued with a new bailiff. Although Ford subpoenaed Wolfgram to appear as a witness, he released Wolfgram from the subpoena the following day. He did not call Wolfgram as a witness at any point in the trial.

### B. The Videotape

¶ 16. Ford's actions at the convenience store were recorded by the store's surveillance cameras. The

---

[2] The circuit court based its decision on *La Valley v. State,* 188 Wis. 68, 205 N.W. 412 (1925); *Surma v. State,* 260 Wis. 510, 51 N.W.2d 47 (1952); *State v. Cotter,* 262 Wis. 168, 54 N.W.2d 43 (1952); and *Cullen v. State,* 26 Wis. 2d 652, 133 N.W.2d 284 (1965).

store's surveillance system uses a "multiplexor" device, which takes time-lapsed still images from multiple cameras and records them sequentially on a standard videotape. When the tape is played on specialized equipment, multiple images appear on the screen simultaneously. However, when it is played on a standard tape player, multiple images from different cameras appear in rapid succession and the tape is incomprehensible.

¶ 17. The tape on which the actions were recorded became damaged and unplayable. Ford filed a motion to dismiss the case, arguing that the tape was exculpatory evidence and should have been preserved by the State.

¶ 18. At the hearing on Ford's motion to dismiss, the officer in charge of the investigation scene testified that he met with the convenience store manager to review the tape. He described the contents of the tape as follows:

> [The store clerk] was behind the counter. A male and female came into the store and the next thing you see is the male and female are at the check-out and the male approaches [the clerk] behind the counter, apparently strikes him with an object and the next thing you see is this male again taking a punch at [the clerk] or [the clerk] puts up his arms in defense to try to block the blow then the two males were—actually [the clerk] and the male were face-to-face and then the male walks back behind—from out behind the till area to check out where the female was still standing and it looked like a money transaction was made for an item and the male and female exited the store.

¶ 19. The officer indicated that Ford was the male who entered the store on the videotape. He did not recall seeing images of Ford picking up a stapler or any object other than the one used for the initial strike to the clerk. The officer testified that he watched the tape

with the store manager approximately two times. He testified that the store manager offered to send the tape to the store's district headquarters so that it could clarify the images on the tape and produce still photographs of the incident.

¶ 20. The store manager testified that after reviewing the tape with the police, she played the tape a couple of times each for the store's owner and for the clerk. However, she did not send the tape to district headquarters.

¶ 21. A few weeks later, a detective retrieved the tape from the store's manager so that the state crime lab could reproduce the tape in a format that could be played on a standard tape player and provide copies to both the State and the defense. A member of the Ashland police department placed the tape into a large, unpadded envelope and mailed it to the crime lab via U.S. Postal Service.

¶ 22. When a state crime lab analyst attempted to view the tape, he noticed that the cassette shell was cracked. He remounted the tape into a new shell. When he began viewing the tape, it appeared normal. However, as the tape approached the point where Ford's actions were recorded, the image deteriorated in a way that is consistent with that portion of the tape having been played repeatedly. As the tape progressed, the analyst's tape player shut down.

¶ 23. The analyst's examination of the tape revealed that there was a film deposit on the surface of the tape. His examination also revealed that the tape was physically damaged; he described the tape as being "crinkled." He tried to remove the film by applying distilled water to the tape, which is the standard procedure for such problems. However, the water did not remove the film.

¶ 24. At the motion hearing the analyst testified that a stronger solvent might remove the deposit from the tape, but it would not repair the crinkling and could damage the tape further. He therefore did not attempt to repair the tape by applying the stronger solvent. At the hearing the parties also discussed that the State offered the tape to one of Ford's attorneys, who later returned the tape. The State remained willing to make the tape available to any expert designated by Ford to review or repair the tape. Ford never designated an expert.

¶ 25. The circuit court denied Ford's motion to dismiss. It determined that there was nothing obviously exculpatory on the tape. The court reasoned that although the testimony indicated that the tape did not show Ford wielding a stapler, that could be due to the limitations of the surveillance system or witnesses forgetting the stapler. The court further determined that there was no bad faith in damaging the tape.

¶ 26. Before trial, Ford filed a motion in limine to prohibit the State from introducing evidence of the contents of the tape. The circuit court denied the motion, stating that the tape was destroyed and that there had been "no showing of bad faith on the part of the police in terms of how the tape came to be destroyed." Thus, it determined that testimony regarding the contents of the tape was admissible under Wis. Stat. § 910.04. At trial, the store manager and the police officer who had viewed the tape testified regarding its contents. Their testimony was consistent with the testimony they had given at the motion hearing.

¶ 27. A jury convicted Ford of battery, bail jumping, and conspiracy to bribe a witness,[3] but acquitted

---

[3] The facts surrounding the bail jumping and conspiracy to bribe a witness charges are not relevant to our review.

him of attempted armed robbery. The court of appeals affirmed, and Ford petitioned for review.

## II

¶ 28. This case requires that we determine whether the circuit court erred in denying Ford's motion for a mistrial. A motion for mistrial is committed to the sound discretion of the circuit court. An erroneous exercise of discretion may arise from an error in law or from the failure of the circuit court to base its decisions on the facts in the record. *State v. Raye,* 2005 WI 68, ¶ 16, 281 Wis. 2d 339, 697 N.W.2d 407.

¶ 29. Ford's claim that he is entitled to automatic reversal is an argument that there is structural error and that the circuit court made an error of law. We review questions of law independent of the determinations rendered by the circuit court or court of appeals. Generally, in determining whether to grant a mistrial in cases where there is no structural error, the circuit court must decide, in light of the entire facts and circumstances, whether the defendant can receive a fair trial. It examines whether the claimed error is sufficiently prejudicial to warrant a mistrial. *State v. Nienhardt,* 196 Wis. 2d 161, 166, 537 N.W.2d 123 (Ct. App. 1995). The denial of a motion for mistrial will be reversed only on a clear showing of erroneous use of discretion. *State v. Ross,* 2003 WI App 27, ¶ 47, 260 Wis. 2d 291, 659 N.W.2d 122.

¶ 30. We also review the circuit court's decision to admit testimony regarding the contents of a videotape. A circuit court's decision to admit or exclude evidence is

13

reviewed under an erroneous exercise of discretion standard. *State v. Shomberg,* 2006 WI 9, ¶ 10, 288 Wis. 2d 1, 709 N.W.2d 370. The test is not whether the reviewing court would admit the evidence, but whether the circuit court "exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record, [and] whether appropriate discretion was in fact exercised." *Id.,* ¶ 11. This court will not find that the circuit court erroneously exercised its discretion if there is a rational basis for its decision. *Id.*

### III

¶ 31. We turn first to the issue regarding the bailiff. Ford contends that the bailiff's contact with the store clerk in the hours after the incident entitles him to automatic reversal.

¶ 32. He cites to a number of cases automatically reversing convictions on the ground that bailiffs serving as prosecution witnesses taint the jury process. Among these is *Turner v. Louisiana,* 379 U.S. 466 (1965), in which jurors were sequestered during a three-day trial and continuously in the company of deputy sheriffs who were serving as bailiffs. The deputies ate with the jurors, conversed freely with them, and ran errands for them. *Id.* at 468.

¶ 33. Two of the deputies were also witnesses for the prosecution. One testified regarding his investigation of the crime scene and incriminating actions taken by the defendant. The other testified about apprehending the defendant, incriminating statements made by the defendant, and how the deputy prevailed upon the defendant to provide a written confession. *Id.* at 467.

¶ 34. The Supreme Court determined that the defendant's right to a jury trial was violated. That right guarantees "a fair trial by a panel of impartial, 'indif-

14

ferent' jurors" and the failure to provide such does not meet the minimum standards of due process. *Id.* at 471–72. The Court noted the particularly close contact between the jurors and the deputies, describing it as "a continuous and intimate association throughout a three-day trial—an association which gave these witnesses an opportunity . . . to renew old friendships and make new acquaintances among the members of the jury." *Id.* at 473.

¶ 35. It further noted that the deputies' testimony was central to the prosecution's case and was outcome-determinative: "the credibility which the jury attached to the testimony of these two key witnesses must invariably have determined" the outcome. *Id.* at 473. The Court concluded that there was "extreme prejudice inherent" in the deputies' relation with the jury and that automatic reversal was required. *Id.* at 473–474.

¶ 36. A few years after *Turner,* the Court again addressed the issue of contact between a jury and a witness who served as a bailiff. In *Gonzalez v. Beto* a county sheriff served as the prosecution's key witness, attesting to the authenticity of the defendant's confession, which had been dictated to the sheriff and signed with an "X" by the defendant. 405 U.S. 1052 (1972). The sheriff also served as jury bailiff, which involved "substantial and continuing contact with and authority over [the jurors] during the entire course of the trial." *Id.* at 1053. The sheriff conversed with the jurors, escorted them to a restaurant, ate with them, and brought them soft drinks during deliberations. *Id.* Immediately after defense counsel challenged the sheriff's credibility, the court asked the sheriff to step down from the witness stand and "retire the jury for a few minutes." *Id.,* n.1.

¶ 37. The Court determined that *Turner* had not established a per se rule requiring reversal when a

prosecution witness comes into contact with the jury. *Id.* at 1055. Rather, it stated that *Turner* was a "recognition of the great prejudice inherent in the dual role of jury bailiff and key prosecution witness." *Id.* The Court concluded that the close association between the sheriff and the jurors together with the sheriff's key testimony merited reversal under *Turner. Id.* at 1056.

¶ 38. Wisconsin cases are in accord with *Turner* and *Gonzalez. La Valley v. State* involved a juror who during the course of the trial received a ride to a dance with the sheriff, danced once with the sheriff's wife, and received a return ride from other friends. 188 Wis. 68, 71, 205 N.W. 412 (1925). This court determined that such involvement could improperly influence even a conscientious juror, for the investigation of the crime had been conducted by the sheriff's office. *Id.* at 80. It therefore reversed the conviction, stating that preserving impartial trials requires that "deliberations and pronouncements must be kept pure, and untainted not only from all improper influences but from the appearance thereof." *Id.*

¶ 39. In *Surma v. State,* 260 Wis. 510, 51 N.W.2d 47 (1952), the bailiff in charge of the jury during deliberations was an arresting officer, had helped obtain a confession from the defendants, and testified for the prosecution. In his bailiff capacity he took the jurors to a meal and ate with the male jurors while his wife ate with the female jurors. *Id.* at 511. Citing *La Valley,* this court reversed the conviction and granted a new trial, stating that "as one of the arresting officers and witnesses for the state, [the bailiff] is almost as closely identified with the prosecution . . . as was the district attorney." *Id.* at 513.

¶ 40. *State v. Cotter,* 262 Wis. 168, 54 N.W.2d 43 (1952), also involved a deputy sheriff serving as jury

16

bailiff. The bailiff had taken part in the investigation of the case and served as a witness for the state. *Id.* at 170. As the jury retired for deliberations, the bailiff told the jury that "they would not hurt my feelings if they hurried." *Id.* Following *Surma* and *La Valley,* this court reversed the conviction, rejecting the view that reversal required a showing of prejudice. *Id.* at 172–73.

¶ 41. Ford argues that his situation is similar to the above cases. He asserts that the bailiff had established a bond with the jury before the circuit court removed him from the case, and that the relationship taints the entire jury deliberation process. Thus, Ford argues that *Turner, Gonzalez, La Valley, Surma,* and *Cotter* require automatic reversal, without any showing of prejudice.

¶ 42. In essence, Ford is arguing that his case involves structural error, that is, a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante,* 499 U.S. 279, 310 (1991); *State v. Shirley E.,* 2006 WI 129, ¶ 62, 298 Wis. 2d 1, 724 N.W.2d 623. Structural errors "infect the entire trial process and necessarily render a trial fundamentally unfair." *Neder v. United States,* 527 U.S. 1, 8 (1999)(internal citations and quotations omitted). They "seriously affect the fairness, integrity or public reputation of judicial proceedings and are so fundamental that they are considered per se prejudicial." *Shirley E.,* 298 Wis. 2d 1, ¶ 62 (internal quotations omitted).

¶ 43. Structural errors are subject to automatic reversal. *Neder,* 527 U.S. at 8; *State v. Harvey,* 2002 WI 93, ¶ 37, 254 Wis. 2d 442, 647 N.W.2d 189. The United

States Supreme Court has found structural error in only a "very limited class of cases." *Id.*[4]

¶ 44. Ford has not set forth any case that supports the conclusion that a structural error requiring automatic reversal exists here. Neither *Turner, Gonzalez,* nor the Wisconsin cases Ford cites resemble the present case. To begin, this is not a case involving a bailiff-witness. *Turner, Gonzalez, Surma,* and *Cotter* each involved a bailiff who also served as a prosecution witness. Here, however, Wolfgram did not serve as a witness in any capacity, and there is no indication that he was ever even considered as a prosecution witness.

¶ 45. Further, Wolfgram's involvement in the case is nothing like the involvement of the bailiffs in the cases Ford cites. In *Turner* and *Gonzalez* the bailiffs provided key testimony for the prosecution regarding incriminating statements or defendant confessions. *Surma* involved a bailiff who was closely involved in the case by serving as an arresting officer and helping obtain a confession from the defendant. In *Cotter* the bailiff took part in the investigation. Although the

---

[4] In *Johnson v. United States,* 520 U.S. 461, 468 (1997), the Supreme Court listed as structural errors complete denial of counsel (*Gideon v. Wainwright,* 372 U.S. 335 (1963)); biased trial judge (*Tumey v. Ohio,* 273 U.S. 510 (1927)); racial discrimination in grand jury selection (*Vasquez v. Hillery,* 474 U.S. 254 (1986)); denial of self-representation at trial (*McKaskle v. Wiggins,* 465 U.S. 168 (1984)); denial of public trial (*Waller v. Georgia,* 467 U.S. 39 (1984)); and defect in reasonable-doubt instruction (*Sullivan v. Louisiana,* 508 U.S. 275 (1993)).

At least one federal court has described the Supreme Court's decision in *Turner* as structural error. *Helmig v. Kemna,* 461 F.3d 960, 963 (8th Cir. 2006). *But see Agnew v. Leibach,* 250 F.3d 1123, 1125 (7th Cir. 2001), which specifically declined to reach the question of whether *Turner* involved structural error.

18

sheriff in *La Valley* did not serve as a prosecution witness, the investigation of the crime in that case was conducted out of the sheriff's office.

¶ 46. The situation here is altogether different. Wolfgram did not investigate the crime, was not a part of the office investigating the crime, did not help obtain an incriminating statement, and did not take part in the defendant's arrest. He simply saw the store clerk sometime after the crime and advised him to call the police and his manager.

¶ 47. Finally, the contact between Wolfgram and the jury is less significant than the contact involved in the other cases. In *Turner* the bailiffs ate and conversed freely with jurors over a three-day trial, and the Court described the association as "intimate" and allowing renewal of old friendships and making new acquaintances. *Gonzalez* involved "substantial and continuing contact" between the bailiff and jury. In *La Valley* the sheriff had contact with a juror in a social context outside of the trial while the trial was ongoing. The *Surma* bailiff and his wife ate with the jurors. *Cotter* involved contact that was significant both because it was inappropriate and because it occurred as the jury retired for deliberations.

¶ 48. In contrast, Wolfgram's contact with the jury was more limited. He did not spend the entire trial with the jurors. Rather, he was with the jury only during voir dire, opening statements, and direct examination of the State's first witness. Wolfgram did not take meals with the jurors, and there is no indication that he renewed old friendships or made new acquaintances. On examination, Wolfgram testified that he had not discussed with the jury his contact with the store clerk. There is no indication that Wolfgram made

inappropriate comments to the jury or had contact with a juror outside of the trial while the trial was ongoing.

¶ 49. Thus, we conclude that this case does not involve structural error requiring automatic reversal. It does not contain a defect that "infect[s] the entire trial process and necessarily render[s the] trial fundamentally unfair." *Neder*, 527 U.S. at 8 (internal citations and quotations omitted). Wolfgram was not a witness, and his testimony therefore could not be given undue weight so as to prejudice the trial. Further, he did not have inappropriate contact with the jurors, which could "seriously affect the ... public reputation of judicial proceedings." *Shirley E.*, 298 Wis. 2d 1, ¶ 62.

¶ 50. Having determined that automatic reversal is not required, we address next whether the circuit court otherwise erred in denying Ford's motion for mistrial. As noted above, the decision whether to grant a mistrial lies within the sound discretion of the circuit court. It must determine, in light of the whole proceeding, whether the basis for the mistrial request is sufficiently prejudicial to warrant a new trial.

¶ 51. Ford's motion for a mistrial was based on two assertions: (1) that Wolfgram could be an important defense witness if he testified that the clerk mentioned nothing about an attempted armed robbery, and (2) that given the role of a bailiff, the jury could have been improperly influenced because they would want to know what the bailiff had to say about the case.

¶ 52. After applying *La Valley, Surma, Cotter,* and *Cullen* to the facts of this case, the court denied the motion for mistrial. It stated:

> There is no indication in this record that the bailiff has had any improper contact with the jury. There is no

20

indication that he said anything to the jury that would reflect his observations of [the victim]. . . .

So, I guess the question is: Is there an appearance of impropriety? I don't see one. He's not a witness for the State. Potentially he'll be a witness for the defense but he's not a witness for the State and there is nothing that he said to the jury that's going to influence them in any way.

So, I deny the motion for mistrial. I don't have a basis for concluding that the parties can't receive a fair trial in this case.

. . . .

From what I've heard I don't consider him a critical witness or even a material witness, we have somebody who is potentially the hundredth person that [the victim] talked to that day after the alleged events. I haven't heard . . . how immediate the contact was between these two, other than it was a couple of hours after the alleged events.

¶ 53. In essence, the circuit court determined that the alleged error is not "sufficiently prejudicial to warrant a mistrial." *Nienhardt*, 196 Wis. 2d at 166. While our research failed to uncover any Wisconsin cases involving contact between a non-witness bailiff and a victim, there are cases involving potential prejudice that provide guidance.

¶ 54. *Cullen v. State* involved a trial bailiff who was married to an investigating officer who served as a prosecution witness. 26 Wis. 2d 652, 660, 133 N.W.2d 284 (1965). The record did not indicate that the jury was aware of the connection. The bailiff was in contact with the jury for about three hours. The jury's lack of awareness of the connection and the "relatively short period during which the jury may have been subjected

to [the bailiff's] influence" led this court to determine that there was no prejudice. *Id.* at 661–62.

¶ 55. Another case involving potential prejudice is *State v. King,* 120 Wis. 2d 285, 354 N.W.2d 742 (Ct. App. 1984). On the second day of trial in an armed robbery case, a juror reported to the bailiff that he knew the complaining witness. *Id.* at 295. When questioned by the court and defense counsel in chambers, the juror indicated that during voir dire he had not recognized the name of the witness as someone he knew. However, when the witness testified, the juror recognized him as a coworker and brother-in-law of another coworker. *Id.*

¶ 56. The juror stated that his only relationship with the witness was as a coworker with whom he exchanged greetings at work. *Id.* He told the court that his relationship with the witness would not affect his judgment. *Id.* The circuit court denied the defendants' motions for mistrial. The court of appeals determined that the circuit court had not erroneously exercised its discretion on the ground that the juror admitted the contact and stated that it would not affect his judgment. *Id.* at 296.

¶ 57. In the present case, Wolfgram was unaware of his involvement in the case until the morning of trial. The jury was unaware of his involvement until the direct examination of the store clerk, and Wolfgram was removed after the direct examination. Wolfgram therefore had very little contact with the jury after his involvement became known. Thus, as in *Cullen,* the jury could have been exposed to Wolfgram's potential influence for only a very limited period of time.

¶ 58. Further, this case involves a jury learning that the bailiff talked to a prosecution witness and urged him to call the police shortly after the crime took place. The potential for prejudice in such a case is no

greater than when it is a juror who knows the complaining witness, as was the case in *King*.

¶ 59. Finally, the circuit court took a number of measures to assure that Ford was not prejudiced. It replaced the bailiff to avoid the possibility that the jurors would inquire about his observations. Because Ford requested that Wolfgram be subpoenaed as a witness, the court excluded the bailiff from the courtroom and instructed him not to discuss the case with witnesses.

¶ 60. More important, the circuit court inquired as to whether the jurors could decide the case fairly and impartially. One juror indicated that Wolfgram was a cousin of someone she was related to by marriage, but that she could set aside any prior contact and decide the case fairly and impartially.

¶ 61. The court asked whether "the contact the jurors have had with Mr. Wolfgram as the bailiff [would] be something that would influence their decision as jurors." No jurors answered "yes." The court further asked if any juror would "not be able to set aside whatever contact they've had with Mr. Wolfgram as bailiff and act fairly and impartially in the case." Again, no juror responded affirmatively. The court was satisfied that Wolfgram's time as bailiff and contact with the clerk was not prejudicial and therefore denied Ford's motion for a mistrial.

¶ 62. Thus, the circuit court decided "in light of the entire facts and circumstances" that the claimed error was not "sufficiently prejudicial to warrant a mistrial." *Nienhardt,* 196 Wis. 2d at 166. Because of the limited potential for Wolfgram to influence the jury and the circuit court's efforts to assure that the jurors could

decide the case fairly and impartially, we determine that the circuit court's decision was not an erroneous exercise of discretion.

## IV

¶ 63. We consider next the circuit court's decision to allow witness testimony regarding the contents of the surveillance tape. Wisconsin Stat. § 910.02[5] provides that in order to prove the content of a writing, recording, or photograph,[6] the original is required. There are several exceptions to this rule, however, and Wis. Stat. § 910.04(1) sets forth one of the exceptions. It provides in relevant part:

> The original is not required, and other evidence of the contents of a writing, recording or photograph is admissible if:
>
> (1) Originals Lost or Destroyed. All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith . . . .

---

[5] Wisconsin Stat. § 910.02 (Requirement of original) provides in full:

> To prove the content of a writing, recording or photograph, the original writing, recording or photograph is required, except as otherwise provided in chs. 901 to 911, s. 137.21, or by other statute.

[6] The definition of "photographs" includes such diverse depictions as still photographs, X-ray films and motion pictures. The rule differs from the corresponding federal rule.

> The Wisconsin rule, unlike FRE 1001(2), does not expressly include "video tapes." The legislative history of the federal rule suggests that videotape was added in order to "expressly" include what was implicit in the rule. Despite this difference, § 910.01(2) should be interpreted as including videotapes because the rule reveals no intent to otherwise exclude them or to limit the rule's reach to those types of depictions specifically listed in the statute.

7 Blinka, *Wisconsin Practice: Evidence*, § 1001.3 (2d Ed. 2001).

24

¶ 64. The essential question here is whether the court erroneously exercised its discretion when it determined that the videotape was destroyed for purposes of § 910.04(1). The decision of whether the definition of "destroyed" can include a tape that is unplayable presents a question of law. However, the question of whether a tape is unplayable is a question of fact. Reviewing courts will not disturb an evidentiary ruling where the circuit court has exercised its discretion in accordance with acceptable legal standards and the facts of record. *Shomberg*, 288 Wis. 2d 1, ¶ 11.

¶ 65. Ford contends that the videotape was not destroyed and that the State should have used "extraordinary methods to clean the tape." Thus, he maintains that the circuit court erred in allowing testimony regarding the contents of the tape. His argument is unpersuasive.

¶ 66. There is no question that the tape was damaged and unplayable when it arrived at the state crime lab. The tape had a cracked casing, it was covered in a film, and it was physically damaged by crinkling. The State attempted to restore the tape to playability. The crime lab analyst began by replacing the cracked casing. When the analyst discovered the film on the tape, he followed standard procedure and attempted to remove the film by applying distilled water.

¶ 67. Although the distilled water failed to remove the film, the analyst did not attempt to use stronger solvents that might have removed it. Such solvents might also have done further damage to the tape. Further, the physical damage to the tape from crinkling could not be cured by adding the solvents.

25

¶ 68. We are satisfied that where a tape is damaged and unplayable, the proponent of the evidence makes reasonable efforts to restore the tape to playability, and those reasonable efforts fail, the tape is destroyed within the meaning of § 910.04(1). We find persuasive the reasoning of a treatise on the federal counterpart of § 910.04(1):

> "Destroyed" usually signifies that the item no longer exists. However, an item may be destroyed for purposes of this rule even if it is not completely obliterated. Writings become unreadable, recordings become inaudible, and photographs fade. In addition, the contents of such items can be intentionally and irreversibly altered. The best-evidence doctrine is all about proving the contents of such items. Thus, so long as the contents can no longer be discerned, it makes sense to conclude that the item is destroyed for purposes of Rule 1004(1) even if the medium on which those contents were recorded still exists. Similarly, partial destruction may be sufficient under Rule 1004(1) to permit the admission of secondary evidence concerning the portion destroyed.

Charles Alan Wright & Victor James Gold, 31 Fed. Prac. & Proc. Evid. § 8014 (2007).

¶ 69. Thus, because the surveillance tape was destroyed, and Ford has made no argument that the State destroyed the tape in bad faith,[7] the testimony

---

[7] In his brief to this court, Ford states that should we determine that the tape is destroyed "the issue may then become one of the State's negligence or bad faith." Elsewhere in the brief he asserts that the circuit court's "finding that the tape was 'destroyed' is the sole question on this issue." At oral argument, counsel stated that he was merely "suspicious that

regarding the contents of the tape is admissible under § 910.04. We therefore determine that the circuit court appropriately exercised its discretion in admitting testimony regarding the contents of the tape.

V

¶ 70. In sum, we determine that the bailiff's contact with the crime victim is not structural error and does not require automatic reversal. Further, the circuit court's determination that the alleged error was not prejudicial was within its discretion. Therefore, the circuit court's decision to deny Ford's motion for mistrial was not an erroneous exercise of its discretion.

¶ 71. In addition, we determine that because the surveillance tape was unplayable, and the State made reasonable efforts to restore it to playability, the circuit court did not err in concluding that the tape was destroyed within the meaning of Wis. Stat. § 910.04(1). We therefore determine that the circuit court did not erroneously exercise its discretion in admitting testimony regarding the contents of the tape. Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

something negligent occurred" and that he did not "think that the police did anything wrong" in leaving the tape with the store manager. These statements cannot be construed as an argument that the tape was destroyed in bad faith, especially where nothing else in the record indicates bad faith. In any case, Ford has not sufficiently developed such an argument for us to consider it here. *Kristi L.M. v. Dennis E.M.*, 2007 WI 85, ¶ 20 n. 7, 302 Wis. 2d 185, 734 N.W.2d 375.