COURT OF APPEALS
DECISION
DATED AND FILED

March 28, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1168-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CF806

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

MICHAEL CHARLES DAUGHERTY,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Rock County: KARL HANSON, Judge. *Affirmed*.

Before Blanchard, Graham, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Michael Daugherty appeals a judgment of conviction for operating a motor vehicle while intoxicated (OWI), as a sixth

offense, following a jury trial. Daugherty argues that the circuit court erroneously exercised its discretion when it denied his motion for a mistrial on the second day of a four-day trial. The asserted ground for a mistrial was that the jury had been exposed to an audiovisual recording of police activity during which an unidentified voice, apparently a dispatcher, was heard to say the phrase "five priors" following Daugherty's arrest and in an apparent reference to him. Daugherty contends that, because this phrase could have been heard and understood by jurors in a way that was prejudicial to him, "it cannot be said that [the] jury was sufficiently impartial." Therefore, he contends, the court was obligated to declare a mistrial. We conclude that Daugherty has not clearly shown that the court erroneously exercised its discretion in denying the motion and accordingly affirm.

## BACKGROUND

¶2 Daugherty crashed a car at an intersection in Beloit at approximately 7:00 p.m. one Sunday evening in August 2019. Responding police arrested Daugherty. As pertinent to this appeal, the State charged him with a violation of WIS. STAT. § 346.63(1)(a) (2021-22).[1]

¶3 At trial, Daugherty's former wife and her current husband testified that Daugherty, before his arrest that evening, arrived unexpectedly at their residence. According to these witnesses, after brief interactions that included a verbal altercation with the current husband, Daugherty got into his car and drove away at a "high rate of speed." He then proceeded to drive around the block

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

2

several times in a "[r]eckless" manner. He hit a curb and crashed the car. Police arrived on the scene a few minutes later.

¶4    Daugherty gave trial testimony that is difficult to track at times, but it included the following. After he had negative interactions with people at his former wife's house, and while he was "upset" and "angry," he "took off" in his car. Shortly thereafter he apparently returned to his former wife's residence, where someone hit him on the head while he had the driver's side window lowered. He then drove again, at which time "somebody" "grabb[ed] at my steering wheel," trying "to pull me out of the car." Because of this, "I couldn't make the corner." The car "hit the curb, and I thought I had a flat."

¶5    Daugherty further testified that he did not consume any alcohol on the day of the crash until after the crash. More specifically, he testified that he got out of the car and ran to hide in a bush, where he drank a full pint bottle of whiskey that had been in the pocket of his shorts. Police found him in the bush after about 20 to 30 minutes. He hid in the bush because he was afraid that people from his former wife's residence might "jump[ him] again."

¶6    One witness called by the prosecution was a person who resided near the crash scene. This witness testified that he saw the crash occur, after which Daugherty "jumped out of the driver's side and took off running." No one else was in the car with Daugherty at the time of the crash. This witness immediately tried to follow Daugherty, lost sight of him at first, but then saw him "in the bushes." The police arrived within five minutes of the crash.

¶7    Officer Zachary Stec, who was among officers who responded to the report of the car crash, testified in part as follows. Stec discovered Daugherty where witnesses had reported that police would find him: "lying in a bush" near

the crash scene. Stec handcuffed Daugherty. After this, Daugherty: did not follow Stec's instructions about how to stand up while handcuffed; "could not maintain his balance upon standing"; emitted "a strong odor of intoxicants" on his breath and from his person; and spoke in a "very slurred" manner. In addition, Daugherty's eyes were "extremely bloodshot and glassy."

¶8      Stec further testified that Daugherty was placed in the back seat of a squad car, at which time he became "loud and boisterous and began blowing on my rear camera, putting his mouth up to the camera and blowing extremely fast, which [Stec] felt was odd behavior." Daugherty denied to police that he had driven the crashed car, but police found a key to the car in his pocket. Stec did not "see anything discarded" when Daugherty emerged from the bush, and Stec did not find any alcohol containers.

¶9      A police-worn body camera recording viewed by the jury reflects that, after the arrest, Officer Stec asked Daugherty if he had "anything to drink today," and that Daugherty responded, "Oh, yeah, a little bit."

¶10      Pursuant to a warrant for a blood draw, Daugherty was found to have a blood alcohol concentration of .178.

¶11      Defense witnesses included a person who testified that, as of the time of trial, she had been in a romantic relationship with Daugherty since 2018, and that the two resided together on the day of his arrest. This witness testified that Daugherty left the residence a little after 6:00 p.m. that day, at which time he "[s]eemed fine and normal" and did not appear to be impaired. She also testified that she had not observed him drink alcohol that day. She testified that it was a 30- to 35-minute drive from their residence to Daugherty's former wife's residence.

4

¶12     The defense also called a hospital pharmacist and consultant who holds a doctorate in clinical pharmacology.  This witness testified that the following was "very plausible":  assuming that Daugherty had a blood alcohol level of zero at the time of the crash at approximately 7:00 p.m., and further assuming that he swiftly consumed one pint of whiskey (40 percent alcohol by volume) over the course of approximately 10 to 12 minutes beginning immediately following the crash, his blood alcohol concentration could have reached .178 by the time his blood sample was drawn at approximately 10:00 p.m. that night.

¶13     At the end of a four-day trial, the jury returned a guilty verdict for a violation of WIS. STAT. § 346.63(1)(a), the charge on which Daugherty was convicted and sentenced.

¶14     We now turn to the aspect of the trial at the heart of this appeal.  On the second day of trial, the prosecution offered as evidence, and proposed to publish to the jury, recordings containing video and sound captured by (1) the body camera that Stec was wearing that evening, and (2) a forward-facing camera mounted on the dashboard of Stec's squad car.  With no objections by the defense, the circuit court admitted this exhibit containing the two recordings and allowed them to be played for the jury.[2]

---

[2] The admitted and published-to-the-jury Exhibit 14, which contains the body camera and dashboard camera recordings, is not in the appellate record.  As discussed below, this means that we assume that all pertinent aspects of the recordings support the challenged circuit court ruling.  *See Duhame v. Duhame*, 154 Wis. 2d 258, 269, 453 N.W.2d 149 (Ct. App. 1989) (appellate courts assume that "every fact essential to sustain the trial judge's exercise of discretion is supported by" pertinent material that has been omitted from the record).

¶15   The prosecutor played portions of the audiovisual body camera recording first, pausing at intervals to pose questions to Stec. Then, with Officer Stec still on the witness stand, the prosecutor played a portion of the dash camera audiovisual recording. Shortly after this recording began playing, defense counsel asked for a sidebar and, outside the presence of the jury, requested a mistrial based on one phrase spoken by a dispatcher during the course of police "radio chatter" audible on the recording that the jury had just heard. After the parties and the court, still outside the presence of the jury, listened to the recording a second time, the circuit court made the following factual findings about the content of the recording and what the court perceived to be its likely effects on the jury.

¶16   Officer Stec and another officer are shown interacting with Daugherty. The jury had already observed, in viewing the body camera recording, aspects of this same sequence of events. But this time the vantage point is the dash camera and police dispatch audio could be heard. Daugherty is handcuffed, the officers are seeking information about him from dispatch, and they are about to move him into the squad car. More specifically, one officer gets on the police radio and calls in to dispatch with Daugherty's name. There is a pause. A dispatcher responds with words that include "valid," followed by something unintelligible, and then the dispatcher can be heard to say, "five priors." The video continued to play for about 35 more seconds, showing other interactions involving police, before defense counsel requested a sidebar and the jury was dismissed.

¶17   The circuit court found that the phrase "five priors" was "very audible" to the court, and the prosecutor acknowledged that he could hear that phrase after replaying the recording. But at the same time, the court suggested that jurors might have missed it under all of the circumstances. The court credited

statements by the prosecutor that he had played the dash camera recording before trial and had not heard "five priors" and that the prosecutor had also not heard that phrase when it was played for the jury.

¶18    The circuit court noted that the court had been watching the jury as the dash camera recording was played. "The jury was attentively watching the video and [jurors] were watching this interaction" between the two officers and Daugherty. The phrase "five priors" was not stated as "a direct answer from an officer testifying about something," nor did it come out of the mouth of one of the officers whom the jury was attentively watching in the recording. Instead, it came from "a disembodied voice." Further, the court described the phrase "five priors" as being "baseless." We interpret this to represent a finding that the phrase lacked meaningful context—that it was not explained or elaborated on through any additional information to which the jury was exposed.

¶19    The circuit court found that, in the context of the case as tried to that point, there "is some ambiguity as to what" the phrase "five priors" would have meant to any juror who did hear it and thought about it. The court said that judges and attorneys, knowing that Daugherty was being tried on a charge of OWI, as a sixth offense, "immediately jump to the idea that five priors" means "five OWI priors." But "that is a logical leap based upon" the general awareness of judges and attorneys and knowledge about this case that the jury here was not privy to. For the jury here, "that is not necessarily the most logical leap to make." It could have meant to them "five prior police contacts," or else "five prior criminal convictions" not involving OWI. Further, the court noted that it had already

determined that if Daugherty were to testify—as in fact came to pass—the jury would learn that Daugherty had three prior convictions, not five.[3]

¶20 Concluding that there was "minimal prejudice" to Daugherty from the "five priors" reference, the circuit court denied the motion for a mistrial. Daugherty appeals, challenging only the denial of his motion for mistrial.

## DISCUSSION

¶21 The circuit court observed, and the State now agrees, that there was the potential for prejudice to Daugherty. That is, the fact that the jury was exposed to the dispatcher saying, "five priors," in an apparent reference to Daugherty raised at least some risk that jurors might conclude that this meant that Daugherty had been convicted of five offenses, which might have included one or more OWI offenses. This in turn created a risk that the jury would improperly rely on the potential existence of prior OWI offenses in reaching its guilty verdict on the OWI count at issue in this appeal. But under the legal standards that we now summarize, the issue is not whether there was a potential risk of prejudice. Instead, the issue is whether Daugherty has clearly shown, based on all of the facts and circumstances, that declaring a mistrial was a manifest necessity. We conclude that Daugherty has not made that clear showing.

¶22 Our supreme court recently summarized applicable standards:

> When faced with a motion for mistrial, "the circuit
> court must decide, in light of the entire facts and

---

[3] The circuit court ruled, outside the presence of the jury that, under WIS. STAT. § 906.09, Daugherty could be impeached with the fact that he had three prior convictions. Consistent with this ruling, when Daugherty took the witness stand at trial he testified that he had been convicted of a crime three times.

> circumstances, whether ... the claimed error is sufficiently prejudicial to warrant a mistrial." *State v. Ford*, 2007 WI 138, ¶29, 306 Wis. 2d 1, 742 N.W.2d 61. We review a circuit court's decision to grant or deny a motion for mistrial for an erroneous exercise of discretion. *Id.* "An erroneous exercise of discretion may arise from an error in law or from the failure of the circuit court to base its decisions on the facts in the record." *Id.*, ¶28 (quoting *State v. Raye*, 2005 WI 68, ¶16, 281 Wis. 2d 339, 697 N.W.2d 407). "Discretion is not synonymous with decision-making. Rather, the term contemplates a process of reasoning." *State v. Gallion*, 2004 WI 42, ¶3, 270 Wis. 2d 535, 678 N.W.2d 197 (quoting *McCleary v. State*, 49 Wis. 2d 263, 277, 182 N.W.2d 512 (1971)).

*State v. Debrow*, 2023 WI 54, ¶15, 408 Wis. 2d 178, 992 N.W.2d 114. "'The denial of a motion for mistrial will be reversed only on a clear showing of an erroneous use of discretion' by the circuit court." *State v. Doss*, 2008 WI 93, ¶69, 312 Wis. 2d 570, 754 N.W.2d 150.

¶23 Elaborating on the statement in *Ford*, quoted in *Debrow*, that the circuit court is to consider "'the entire facts and circumstances,'" this includes consideration of the relative strength of the prosecution's case. *Oseman v. State*, 32 Wis. 2d 523, 528-29, 145 N.W.2d 766 (1966) (strength or weakness of case relevant to determine if "error" forming basis for mistrial motion "is prejudicial").[4]

¶24 We begin the analysis by noting that Daugherty does not argue that the circuit court committed clear error in making any finding of fact regarding the

---

[4] The State includes a section in its brief with the heading, "Any error in denying Daugherty's mistrial motion was harmless," and it cites as authority an opinion involving harmless error analysis in the context of a constitutional challenge to a jury instruction in a criminal case. We question whether the harmless error doctrine could apply in the context here. However, we construe the substantive points made by the State in this section of its brief as being equivalent to an argument that the circuit court did not erroneously exercise its discretion in denying the mistrial motion in part because the entire facts and circumstances here included a strongly supported prosecution case and a weakly supported theory of defense.

playing of the dash camera recording or the nature of its contents. Further, by failing to include the recording in the record, Daugherty has left us to assume that, if we were to observe and listen to the recording, our viewing would support the circuit court's suggestion that, while the phrase "five priors" was "very audible" to the court, jurors who were focusing on the conduct of the officers visible in the recording might not have heard or focused on the one-time reference by a "disembodied voice" to "five priors." *See **Duhame v. Duhame***, 154 Wis. 2d 258, 269, 453 N.W.2d 149 (Ct. App. 1989).

¶25 The circuit court pointed out that 35 seconds passed from the time the phrase "five priors" could be heard, for the first and only time by jurors, until the dash camera recording was stopped and the jury was excused. This contrasts with the way the prosecution presented the body camera video, before the dash camera video was played—namely, stops and starts of the body camera recording, interspersed with questions posed to Officer Stec that focused on aspects of the recording. This supports the court's conclusion that the jury was not likely to hear, consider, and misuse in its deliberations the phrase "five priors."

¶26 It is true, as noted above, that the circuit court and the State now on appeal assume a risk of prejudice. These assumptions are consistent with the caution from our supreme court about the dangers of propensity inferences that jurors may make in connection with prior convictions in OWI cases. *See **State v. Warbelton***, 2009 WI 6, ¶¶46-47, 315 Wis. 2d 253, 759 N.W.2d 557. The court has noted that, "upon learning that the defendant has prior convictions, suspensions, or revocations, jurors are likely to infer that these prior offenses were also for drunk driving," and that "upon learning that the defendant had multiple prior offenses, jurors are likely to infer that the current charge is part of a pattern of behavior." *Id.*, ¶47. From these assumptions "jurors might conclude that even

10

if the defendant is not guilty on the particular occasion charged, the defendant likely committed the same offense on many other occasions without being caught." *Id.*

¶27 At the same time, however, the jury here was not exposed to unambiguous testimony that Daugherty had five prior OWI convictions or even five prior convictions, but instead only a voice saying "five priors." Indeed, the jury was informed through Daugherty's own unchallenged testimony that he had been convicted of a crime three times.[5] For this reason, any juror who heard and focused on the "five priors" reference, and from this speculated that this meant five prior convictions for a crime, would have had contrary evidence to consider. Put somewhat differently, the "five priors" reference added no new basis for any juror who would unfairly and unreasonably assume that Daugherty was guilty of the charged OWI because he has prior convictions, which could include one or more OWI offenses—such a juror already had a basis for such an unfair and unreasonable conclusion through Daugherty's testimony.

¶28 Further, the circuit court was exceptionally careful in making a detailed record and also in giving Daugherty a full opportunity to present arguments and offer any curative instructions that he might suggest. The court agreed with Daugherty's position that any instruction would only serve to draw the jury's attention to the reference, to Daugherty's potential disadvantage. Daugherty does not criticize any aspect of the court's handling of this incident except to challenge its ultimate decision to not grant a mistrial.

---

[5] Daugherty does not challenge the circuit court's decision that he could be impeached with the fact that he had been convicted of three criminal offenses.

¶29   Another factor weighing against reversal of the circuit court's discretionary decision was the strength of the prosecution's evidence and the weakness of the defense theory. *See **Oseman***, 32 Wis. 2d at 528-29. As summarized above, there was strong, consistent evidence that, at the time of the crash, Daugherty had "consumed a sufficient amount of [alcohol] to cause [him] to be less able to exercise the clear judgment and steady hand necessary to handle and control a motor vehicle." *See* WIS JI—CRIMINAL 2664. In contrast, the record suggests that his defense that he swiftly downed a pint of whiskey in the bushes was not strong. For example, the testimony of his romantic partner was not especially exculpatory on its face, in that it left time for him to have consumed a large quantity of alcohol between the moment when she testified he left their residence while appearing sober and the moment of the crash. Further, a major premise of the defense expert's testimony was to assume the truth of Daugherty's account of drinking voluminously in the bush immediately after the crash.

¶30   Daugherty attempts unsuccessfully to analogize this case to ***Mulkovich v. State***, 73 Wis. 2d 464, 243 N.W.2d 198 (1976). In that case, our supreme court concluded that the circuit court committed prejudicial error by reading to a newly empaneled jury the portion of the information alleging that the defendant was a repeat offender who had previously been convicted of a felony.

*Id.* at 467. The facts in ***Mulkovich*** are so different that it does not support the proposition that a mistrial was required on the facts here.[6]

## CONCLUSION

¶31 For all of these reasons, we affirm the judgment.

*By the Court*.—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[6] We call to the attention of Daugherty's counsel that both of his appellate briefs fail to comply with WIS. STAT. RULE 809.19(8)(bm), which addresses the pagination of appellate briefs. *See* RULE 809.19(8)(bm) (when paginating briefs, parties must use "Arabic numerals with sequential numbering starting at '1' on the cover"). This rule has been amended, *see* S. CT. ORDER 20-07 (eff. July 1, 2021), in light of the general requirement of electronic filing of briefs in PDF format and the fact that briefs are electronically stamped with page numbers when they are accepted for e-filing. As our supreme court has explained, the new pagination requirements ensure that the numbers on each page of a brief "will match ... the page header applied by the eFiling system, avoiding the confusion of having two different page numbers" on each page.