COURT OF APPEALS
DECISION
DATED AND FILED

December 29, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2021AP1468-CR**

Cir. Ct. No. **2020CF73**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

CHARLES RIP RIDLEY,

   DEFENDANT-APPELLANT.

        APPEAL from a judgment of the circuit court for Douglas County: GEORGE L. GLONEK, Judge. *Affirmed*.

        Before Stark, P.J., Hruz and Gill, JJ.

        **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

        ¶1     PER CURIAM. Charles Rip Ridley appeals from a judgment of conviction, following a jury trial, for second-degree sexual assault with use of

force, aggravated battery with intent to cause great bodily harm, false imprisonment, and first-degree recklessly endangering safety, all as a domestic abuse repeater and with a domestic abuse enhancer. At trial, Ridley moved for a mistrial after an inadmissible photograph was momentarily published to the jury and the victim testified that Ridley had previously choked her, which violated the circuit court's previous ruling on other-acts evidence. The court denied Ridley's motion.

¶2 Ridley makes three arguments on appeal: (1) the circuit court erred by failing to strike a prospective juror for cause based on the juror's subjective bias; (2) the court erred by denying Ridley's motion for a mistrial; and (3) in addition to the above-mentioned violation of the court's other-acts ruling, the victim's reference to Ridley's previous incarceration also violated the court's ruling on other-acts evidence and was prejudicial. For the reasons that follow, we affirm.

## BACKGROUND

¶3 On February 9, 2020, police responded to a report of a battery in Superior, Wisconsin. When police arrived, they found Carol[1] "naked on the floor covered by a blanket in the kitchen" of a home. According to police, Carol "was visibly shaking, crying, and at times having a hard time breathing" and "her eyes appeared to be 'terrified.'" When asked what had happened, Carol reported that Ridley, whom she had been in a romantic relationship with, had "abducted her

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2019-20), we use a pseudonym when referring to the victim in this case. All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

from St. Paul, [Minnesota,]" "had been holding her captive inside [Ridley's daughter's nearby apartment] for over a week[,] and had been starving" and otherwise abusing her both sexually and physically.

¶4 According to Carol, during the week that she and Ridley were at Ridley's daughter's apartment, they had been using methamphetamine, and, at some point, Ridley's behavior toward her changed.[2] In one incident, Ridley became jealous because he had seen a "guy looking at [Carol]," and when she would not "come clean" after denying this happened, Ridley began punching her in the face. Ridley became physical with Carol again after she "refused to do hot rails[3] with him." At trial, Carol explained that Ridley hit her with a hammer "all over" her body, including her hips, knees, and back. According to Carol, "after [Ridley] was beating me with that hammer, he started saying, 'your family will not recognize you the next time they see you.'" She also testified that Ridley threatened her with a knife.[4] Carol explained that Ridley "kept telling [her] he was going to kill [her]" and "told [her] that [she] was about to die."

¶5 Ridley also initiated unwanted sexual intercourse with Carol, including oral, anal, and vaginal intercourse. Carol testified that Ridley "pretty much just does whatever he wants to do however he ever wants to do it for as long

---

[2] Carol told police officers that Ridley did not allow her to leave the apartment, and "when [Ridley] went to the bathroom, she was forced to go with him. If [Ridley] was taking a shower, she was forced to go with him into the shower." Carol testified that she was unable to contact police because before they left Minnesota, Ridley took her phone, gave it to his brother, and it was never returned.

[3] Carol testified that "hot rails" is a method by which people ingest methamphetamine.

[4] Additionally, Carol initially reported to law enforcement that Ridley "kept telling her that he would shoot her with his pistol," although "she never saw the pistol."

as he wants to do it." She explained that she "could not tell him no" because "that would've been like death in itself" and she "knew [she would] probably get [her] head tore off if [she] did. Not probably, [she] would." According to Carol, she did not engage in sexual intercourse with Ridley "because [she] wanted to" but did so "because [she was] afraid."

¶6 Ultimately, Carol escaped from Ridley by jumping naked out of a second story window into a snowbank. Carol testified that just before she escaped, Ridley moved her to a different room in the apartment because Ridley's daughter told him that her neighbors were "complaining" and were "concerned" due to the noise from Ridley's attacks on Carol. Ridley then took Carol's clothes from her and left the room to retrieve the hammer, which is when Carol jumped out the window. She "ran across the snow … looking for just a house that had a light on." Carol knocked on the door of one home and informed the homeowner that she was being abused. The homeowner provided Carol with a blanket to cover herself and called the police.

¶7 When officers responded, Carol was taken to the hospital and administered a sexual assault nurse examiner (SANE) exam. Ridley was arrested that same night, and after obtaining a search warrant for Ridley's daughter's apartment, law enforcement recovered a "blue handled claw hammer."

¶8 The State charged Ridley with second-degree sexual assault with use of force, aggravated battery with intent to cause great bodily harm, strangulation and suffocation, and false imprisonment, all with the domestic abuse enhancer. Later, by amended Information, the State added a charge of first-degree recklessly endangering safety and charged all the crimes as a domestic abuse repeater and with a domestic abuse enhancer. Before trial, the State also filed a motion to

admit other-acts evidence of Ridley's conviction[5] on domestic violence offenses against Carol that occurred in Minnesota in 2017.[6] In its motion, the State alleged that the prior conviction and the current charges shared many similarities. After a hearing, the circuit court granted the State's other-acts motion.[7] The case proceeded to trial.

¶9 During voir dire, defense counsel asked the prospective jury pool whether there were "people out there that think, well, … [Ridley] had to have done something wrong. I mean, people don't end up in court in a jury trial when they didn't do anything wrong." One prospective juror expressed an opinion that "[i]t seems like one of [the charges] has got to be true" for Ridley to have been charged with five crimes. The circuit court entered into a colloquy with the prospective juror, concluded that he had been rehabilitated, and eventually denied Ridley's motion to strike the juror for cause. The prospective juror did not sit on Ridley's jury, however, as Ridley removed him from the panel by using a peremptory strike.

¶10 The State called Carol to testify. Carol began her testimony with the other-acts evidence from 2017, which involved Ridley not allowing her to leave and assaulting her by hitting her with his fist and "stomping [her] with [his] boot," which left "boot prints in [her] forehead and the side of [her] face." She testified

---

[5] We note that the record does not clearly state whether there was a single judgment of conviction for multiple offenses or multiple convictions for those offenses.

[6] The 2017 incident giving rise to Ridley's prior conviction also occurred while Carol and Ridley were in a relationship. Carol testified that they did not have contact after the 2017 incident, but they again entered into a relationship in January 2020.

[7] On appeal, Ridley does not challenge the circuit court's decision admitting the other-acts evidence.

that she was left with a "straight cut" that "opened [her] face up badly" and required stitches. Carol then stated that Ridley was convicted for the 2017 incident. The State inquired whether Carol had any contact with Ridley since the 2017 incident, and Carol responded, "Not until he got—no. He went to prison." Defense counsel objected, and the State immediately asked the question again. This time, Carol responded that she had not had in-person contact with Ridley without mentioning prison. The circuit court did not address defense counsel's objection.

¶11   During Carol's testimony, the State also introduced several pictures as exhibits. Many of the pictures showed Carol in the aftermath of the attack. One picture, however—Exhibit 11—was a picture of Ridley, which he describes on appeal as depicting him "in jail, shoeless, with his arms behind his back. His upper torso appears to be drenched, and his face is twisted into a manic, or menacing expression." Defense counsel objected to Exhibit 11's introduction due to lack of foundation, and the circuit court sustained the objection. Nevertheless, as the State was publishing the pictures to the jury, Exhibit 11 was momentarily published on a screen visible to the jury in the courtroom. Defense counsel objected, and the prosecutor explained that "[i]t was a mistake" and that she had quickly changed the image.

¶12   During Carol's cross-examination, she also alleged that Ridley had choked her. Carol explained that Ridley had been choking her just before his daughter came into the room to inform him that the neighbors were complaining. Defense counsel observed that Carol had not "testified about any choking" during her direct examination, and he continued questioning her about the alleged conduct. On redirect, the State also asked questions about choking and whether Ridley had "put his arms or his hands around [Carol's] throat during one of the

6

times that he was attacking [Carol] in Superior." Carol responded by stating that her "throat was already messed up because he had choked me … two previous times." Defense counsel immediately objected, and, at first, the circuit court overruled the objection. The court later sustained the objection when defense counsel clarified that the previous choking incidents were not included in the 2017 other-acts evidence.[8] The court then struck the testimony and told the jury to disregard it.

¶13 Following Carol's testimony, and outside the presence of the jury, Ridley moved for a mistrial for two reasons: the prosecutor publishing Exhibit 11 to the jury and Carol's discussion of the previous choking incidents. The circuit court denied Ridley's motion on both grounds. The trial then continued.

¶14 In addition to Carol's testimony, the jury heard testimony from various law enforcement personnel, the SANE, and an analyst from the state crime laboratory. The jury was told that Carol's DNA was found on the head of the hammer and that, based on the tests conducted, there is "very strong support that [Ridley] is a contributor" to the mixed DNA profile found on the hammer's handle. Further, Ridley's DNA was found in both Carol's vaginal and neck swabs. Ridley called Carol as his sole witness, only to ask if she had ever been convicted of a crime and how many times.

¶15 The jury found Ridley guilty of second-degree sexual assault with use of force, aggravated battery with intent to cause great bodily harm, false

---

[8] Defense counsel explained to the circuit court that "there was an incident just months before or maybe even weeks before the incident in this case where [Carol] alleged that [Ridley] had choked her, and that was not part of the other-acts motion."

imprisonment, and first-degree recklessly endangering safety, but it found him not guilty of strangulation and suffocation. The circuit court sentenced Ridley to concurrent sentences on all counts, with Ridley's conviction for second-degree sexual assault carrying the longest sentence at fifteen years' initial confinement followed by ten years' extended supervision. Ridley appeals.

## DISCUSSION

¶16    On appeal, Ridley makes three arguments that he was denied a fair trial. First, he claims that the circuit court erred by failing to strike the prospective juror for cause based on the juror's subjective bias. Second, Ridley argues that the court improperly denied his motion for a mistrial based on the prosecutor presenting the inadmissible photograph to the jury and Carol's testimony that Ridley had choked her in the past. Third, he argues that Carol's reference to Ridley's previous incarceration also "violated the court's ruling on other-acts, and was highly prejudicial."

¶17    Ridley argues first that he is entitled to a new trial because the prospective juror in this case was subjectively biased. According to Ridley, when the circuit court failed to strike the prospective juror for cause, Ridley was denied due process of law. "The United States and Wisconsin Constitutions guarantee a criminal defendant the right to a trial by an impartial jury." *State v. Tobatto*, 2016 WI App 28, ¶16, 368 Wis. 2d 300, 878 N.W.2d 701 (citation omitted). We presume that prospective jurors are impartial. *State v. Funk*, 2011 WI 62, ¶31, 335 Wis. 2d 369, 799 N.W.2d 421. "The party challenging a juror's impartiality bears the burden of rebutting this presumption and proving bias." *Id.*

¶18    In Wisconsin, there are three types of prospective juror bias: (1) statutory bias; (2) subjective bias; and (3) objective bias. *State v.*

8

*Faucher*, 227 Wis. 2d 700, 716, 596 N.W.2d 770 (1999). Here, Ridley alleges that the prospective juror was subjectively biased. A prospective juror's subjective bias "is revealed through the words and the demeanor of the prospective juror," *id.* at 717, and we must consider "whether the record reflects that the juror is a reasonable person who is sincerely willing to set aside any opinion or prior knowledge that the juror might have," *State v. Kiernan*, 227 Wis. 2d 736, 745, 596 N.W.2d 760 (1999).

¶19    In this case, regardless of whether the prospective juror was subjectively biased and whether the circuit court erred by not striking the prospective juror for cause, we conclude that any error was harmless. *See State v. Lindell*, 2001 WI 108, ¶80, 245 Wis. 2d 689, 629 N.W.2d 223 ("The legislature intended the doctrine of harmless error to apply to jury selection." (citation omitted)); *see also* WIS. STAT. § 805.18; *State v. Dyess*, 124 Wis. 2d 525, 547, 370 N.W.2d 222 (1985) (applying § 805.18 to criminal cases). In *Lindell*, our supreme court determined that "a circuit court's failure to excuse a juror who should have been excused is harmless error if the defendant uses a peremptory challenge to remove that juror and ends up with a fair, impartial jury." *State v. Sellhausen*, 2012 WI 5, ¶39, 338 Wis. 2d 286, 809 N.W.2d 14 (citing *Lindell*, 245 Wis. 2d 689, ¶¶115-20, 131).

¶20    Ridley concedes that *Lindell* represents the current state of the law in Wisconsin. He argues, however, that "*Lindell* was wrong when it [was] decided" because it leaves him without a "remedy for the violation of his most basic, fundamental constitutional rights." Instead, Ridley advocates for "[a] return to the [*State v. Ramos*, 211 Wis. 2d 12, 564 N.W.2d 328 (1997),] rule of automatic reversal." Returning to the law under *Ramos*, however, would require that we overrule *Lindell*, which expressly overruled *Ramos*. *See Lindell*, 245

9

Wis. 2d 689, ¶¶51-120, 131. We are not at liberty to overrule Wisconsin Supreme Court precedent. *Cook v. Cook*, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997) ("The supreme court is the only state court with the power to overrule, modify or withdraw language from a previous supreme court case.").

¶21 Ridley used a peremptory strike on the prospective juror in this case, and that juror did not sit on the jury. Ridley does not otherwise claim that his jury was biased, unfair, or partial or that he was somehow inappropriately forced to use his peremptory challenges. Accordingly, any error in failing to strike the prospective juror for cause was harmless beyond a reasonable doubt.

¶22 Second, Ridley argues that the circuit court improperly denied his motion for a mistrial. As noted above, Ridley moved for a mistrial on two grounds: the accidental publication of Exhibit 11 to the jury and Carol's testimony that Ridley choked her on two prior occasions. Ridley asserts that the cumulative effect of these events was that the jury was exposed to highly prejudicial material, and the "evidentiary bell simply could not be unrung." (Formatting altered.) For the reasons that follow, we disagree that the court erred by denying Ridley's motion for a mistrial.

¶23 When confronted with a mistrial request, the circuit court must determine, "in light of the whole proceeding, whether the basis for the mistrial request is sufficiently prejudicial to warrant a new trial." *State v. Bunch*, 191 Wis. 2d 501, 506, 529 N.W.2d 923 (Ct. App. 1995). Stated another way, the court was required to determine whether Ridley could receive a fair trial, in light of all the facts and circumstances. *See State v. Ford*, 2007 WI 138, ¶29, 306 Wis. 2d 1, 742 N.W.2d 61. "[N]ot all errors warrant a mistrial and 'the law prefers less

drastic alternatives, if available and practical.'" *State v. Givens*, 217 Wis. 2d 180, 191, 580 N.W.2d 340 (Ct. App. 1998) (citation omitted).

¶24     As an initial matter, we note that Ridley and the State disagree as to the standard of review we are to apply on appeal.  The State argues that a motion for a mistrial is committed to the sound discretion of the circuit court.  *See **Bunch***, 191 Wis. 2d at 506.  Thus, we would reverse a circuit court's ruling on a motion for a mistrial "only on a clear showing of an erroneous exercise of discretion."  *Id.* As Ridley observes, however, we accord differing levels of deference to a circuit court's ruling on a mistrial motion based on the circumstances underlying the request.  *See id.* at 507.  For example, when the defendant seeks a mistrial "on grounds not related to the State's alleged laxness or overreaching, we give the [circuit] court's ruling 'great deference.'"  *Id.* (citation omitted).

¶25     Ridley contends, however, that "prosecutorial laxness" induced him to request a mistrial, and therefore he is "entitled to a less deferential standard of review" and we "are to give stricter and more searching scrutiny to the judge's determination."  *See **State v. Barthels***, 174 Wis. 2d 173, 184, 495 N.W.2d 341 (1993) ("If … the prosecutor requests the mistrial, or the judge determines that the defendant's request [for a mistrial] was occasioned by prosecutorial overreaching or laxness, then this court gives stricter and more searching scrutiny to the judge's decision to grant a mistrial."), *abrogated in part by **State v. Seefeldt***, 2003 WI 47, ¶33, 261 Wis. 2d 383, 661 N.W.2d 822.

¶26     We disagree that we are required to apply "stricter and more searching scrutiny" to the circuit court's decision in this case.  As we note below, the court did not specifically find that the errors in this case were the result of prosecutorial laxness.  Instead, the court determined, and we agree, that one error

11

was inadvertent and the other error was not caused by or expected by the State. Even if we were to apply the standard advocated by Ridley, however, we would conclude, based on the record, that the court did not erroneously exercise its discretion by denying Ridley's request for a mistrial.

¶27    As to the accidental publication of Exhibit 11 to the jury, Ridley argued before the circuit court that the photograph was "prejudicial" because "[i]t shows [Ridley] in handcuffs[9] with kind of a menacing look on his face."  The prosecutor admitted that publishing the photograph "was an accident" and apologized for the "complete mistake."  She explained, however, that the photograph was on the screen for "literally, … less than a full second" and "[a]s soon as [the prosecutor] saw it pop up, [she] scrolled again so that it would not be recognizable to the jury."  The court found that the photograph was on the screen "for a very momentary period of time" and "the televisions are at some distance from the jury."  Accordingly, the court determined that "for the amount of time and the distance for the jury to take a look at that, I certainly don't think they would even know what was on it.  So I don't think that there is any prejudice there."

¶28    While it is difficult to find support for the circuit court's conclusions regarding the length of time the photograph was on the screen and the distance of the screen from the jury based on a written transcript, Ridley does not specifically contest these findings on appeal.  And although we agree that the photograph was

---

[9] We note, based on our review of Exhibit 11, that the photograph shows Ridley with his hands behind his back, but handcuffs are not visible in the photograph.  On appeal, Ridley appears to acknowledge this fact, as he argues that the photograph depicts Ridley "with his arms behind his back" without mentioning handcuffs.

12

not helpful to Ridley, we conclude that it did not contain anything incriminating such that it would support his convictions. Regardless, the jury was instructed regarding what was properly to be considered evidence, and Exhibit 11 was not marked or received into evidence by the court. Therefore, we agree that the accidental publishing of Exhibit 11 to the jury was not sufficiently prejudicial to warrant a new trial.

¶29     As to Carol's testimony that Ridley had choked her on two prior occasions, Ridley argued that the testimony was not part of the other-acts motion and was prejudicial.[10]  As noted above, once it became clear that the State agreed that the testimony was not part of the other-acts motion, the circuit court immediately struck the answer and instructed the jury not to consider it.  *See **State v. LaCount***, 2008 WI 59, ¶23, 310 Wis. 2d 85, 750 N.W.2d 780 ("Jurors are presumed to have followed jury instructions.").  At the end of the trial, the court also reminded the jury to "[d]isregard the stricken testimony."  Further, as the State argues, the jury was also instructed on the proper use of other-acts evidence; thus, even if the jury did consider Carol's testimony about choking with the admissible other-acts evidence, we would presume the jury considered it for a proper purpose.  *See **State v. Jennaro***, 76 Wis. 2d 499, 508, 251 N.W.2d 800

---

[10] Ridley also argues that "[t]here is a longstanding presumption against admitting evidence of other crimes a defendant has committed."  The State disagrees.  It cites **State v. Speer**, 176 Wis. 2d 1101, 1115, 501 N.W.2d 429 (1993), for the proposition that "[r]ather than discouraging the admission of other acts, WIS. STAT. § 904.04(2) 'favors admissibility in the sense that it mandates the exclusion of other crimes evidence in only one instance: when it is offered to prove the propensity of the defendant to commit similar crimes.'"  There is no dispute that Carol's testimony regarding being choked by Ridley was inadmissible other-acts evidence, but the question of a presumption against admitting other-acts evidence does not weigh on the issue of whether the evidence's introduction was sufficiently prejudicial to warrant a new trial, which is the question before this court.  Accordingly, we do not address Ridley's argument further.

(1977) ("It is the general rule in this state that limiting and admonitory instructions are presumed to cure the prejudicial effect of erroneously admitted evidence."). The court specifically found that the choking incident "was not a question asked or delved into by the State," meaning that the State did not solicit Carol's testimony on this point. Accordingly, we agree that the error in this case was cured when the jury was instructed not to consider Carol's testimony about being choked by Ridley, and it was not sufficiently prejudicial to warrant a new trial.

¶30 Third, and finally, Ridley argues that the jury was exposed to improper and highly prejudicial evidence when Carol testified that Ridley had been in prison, and the circuit court ignored defense counsel's corresponding objection. As noted above, when the State asked whether Carol had any contact with Ridley since 2017, Carol responded, "Not until he got—no. He went to prison." Defense counsel simply stated, "Objection," and Carol answered again without referencing prison and the trial continued. The court did not address defense counsel's objection on the record, defense counsel did not later address the objection or clarify the objection, and defense counsel did not allege on the record that Carol's reference to prison was a basis for Ridley's mistrial motion.

¶31 Thus, the State claims that Ridley did not properly preserve his objection to Carol's statement that Ridley was in prison. It cites *State v. Agnello*, 226 Wis. 2d 164, 172-73, 593 N.W.2d 427 (1999), for the proposition that "the objector must articulate the specific grounds for the objection unless its basis is obvious from its context."[11] *See also* WIS. STAT. § 901.03(1)(a) (stating that error

---

[11] In reply, Ridley—we believe, correctly—argues that the basis for his objection was obvious as "references to Mr. Ridley's previous incarceration violated the court's ruling on other-acts."

may not be predicated upon a ruling admitting evidence unless a substantial right of the party is affected and "a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context"). In the alternative, the State argues that even if Ridley did properly preserve his objection, any error in admitting the testimony was harmless.

¶32    We agree with the State that regardless of whether Ridley properly preserved his objection, any error in admitting Carol's testimony was harmless. *See* WIS. STAT. § 901.03(1). "Harmless error analysis requires us to look to the effect of the error on the jury's verdict." *State v. Hunt*, 2014 WI 102, ¶26, 360 Wis. 2d 576, 851 N.W.2d 434. "For the error to be deemed harmless, the party that benefited from the error—here, the State—must prove 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* (citation omitted). Our supreme court

> has previously articulated several [nonexhaustive] factors to assist in a harmless error analysis, including but not limited to: the importance of the erroneously admitted or excluded evidence; the presence or absence of evidence corroborating or contradicting the erroneously admitted or excluded evidence; the nature of the defense; the nature of the State's case; and the overall strength of the State's case.

*Id.*, ¶27. We also consider "the frequency of the error" and "whether the erroneously admitted evidence duplicates untainted evidence." *State v. Harris*, 2008 WI 15, ¶45, 307 Wis. 2d 555, 745 N.W.2d 397.

¶33    Based on our review of these factors, we conclude that Carol's error in testifying that Ridley previously went to prison did not contribute to the jury's guilty verdict. First, the error occurred only once: Carol mentioned that Ridley was in prison after the 2017 incident only one time during the two-day trial.

Further, when the State asked Carol again whether she had any contact with Ridley since 2017, Carol did not repeat her statement about Ridley being in prison and no additional attention was drawn to Carol's earlier statement. *See id.*, ¶89 (noting that "the State's, the defendant's, and the circuit court's attempts to limit any emphasis on the evidence" were a consideration under the harmless error analysis).

¶34 Next, Ridley's prior incarceration was not a key piece of evidence. Prior to mentioning Ridley's incarceration, Carol had just finished testifying regarding *admissible* other-acts evidence concerning the 2017 domestic abuse incident, where Ridley struck her in the head with his fist and stomped on her face with his boot, which led to injuries that required stitches. The jury learned that Ridley had been convicted of "some offenses" for that incident. Given this testimony, it would have been reasonable for the jury to assume that Ridley had gone to prison as the result of his conviction; thus, Carol's testimony about Ridley's incarceration both seems to duplicate "untainted evidence" and was also not "important" within the broader case.

¶35 Finally, as to the nature and strength of the State's case, we conclude that the State had a strong case against Ridley. Carol testified in detail regarding the abuses she experienced at Ridley's hands and how she escaped from him. While Carol's testimony was certainly the lynchpin of the State's case, the State also presented DNA evidence connecting Ridley to both wielding the hammer against Carol and sexually assaulting her. Further, the State presented testimony from the officer who responded to Carol's initial report and documented Carol's injuries as well as from the nurse who examined Carol at the hospital. In particular, the nurse testified as to Carol's injuries, including the existence of four injuries "with the same pattern" of a "red mark with [a] sort of circle halo around

them," which we presume to be the result of Carol being struck by the hammer. The nurse also explained that one of the injuries to Carol's back would not have occurred "without significant force."

¶36    On appeal, however, Ridley argues that this court's unpublished decision in *State v. Castillo*, No. 2020AP983-CR, unpublished slip op. (WI App June 29, 2021),[12] should guide our analysis. In that case, the defendant, who was charged with first-degree sexual assault of a child, also argued that the circuit court erred by denying his motions for a mistrial. *Id.*, ¶1. The victim, who was eight years old, testified during the trial, and during her testimony, she responded, unprompted, to one of the prosecutor's questions by stating that Castillo "did it to three other little girls." *Id.*, ¶12. Later, another witness testifying for the defense discussed Castillo getting a job "if he gets out." *Id.*, ¶15. The court immediately struck both comments and told the jury to disregard them. *Id.*, ¶¶12, 15.

¶37    We reversed and remanded for a new trial, concluding that "the combined prejudicial effect" of the witnesses' statements "was so great that the [circuit] court's cautionary instructions were insufficient to remedy the error." *Id.*, ¶3. In particular, we noted that "[t]aken together, the two statements could have led a reasonable jury to conclude that Castillo had been incarcerated prior to trial *because* he had sexually assaulted other little girls." *Id.*, ¶57. "Stated differently, [the witness's] statement suggesting that Castillo was incarcerated enhanced the credibility of [the victim's] statement about his sexually assaulting

---

[12] An unpublished opinion authored by a member of a three-judge panel and issued on or after July 1, 2009, may be cited for its persuasive value. WIS. STAT. RULE 809.23(3)(b).

other girls by giving rise to a reasonable inference that Castillo was incarcerated as a result of those acts." *Id.*

¶38    Ridley argues that "[t]he inadmissible evidence the jury was exposed to in this case is just as prejudicial as in *Castillo*." However, we are not bound by this court's conclusion in *Castillo*. Apart from *Castillo*'s status as an unpublished decision, its conclusion was based on an entirely different factual record. Unlike in *Castillo*, Ridley's prior conduct against Carol was properly admitted as other-acts evidence, while the fact that Castillo allegedly sexually assaulted other little girls was not. *See id.*, ¶45. Thus, Carol's comment about prison did not have the same or similar impact upon the jury that it did in *Castillo*, given that the jury was already aware of Ridley's prior conduct and that it led to his prior incarceration. Further, the victim's credibility in *Castillo* and Carol's credibility were not similarly on trial. As noted, while Carol's testimony was central to the State's case, there was also corroborating evidence presented to the jury, which was lacking in *Castillo*. *See id.*, ¶55 ("[T]here was no physical evidence that Castillo assaulted [the victim], nor was there any witness who directly corroborated either [the victim's] or Castillo's version of the events."). Carol's comment about prison did nothing to bolster her credibility when the jury already knew that Ridley had been convicted of a crime for his conduct in 2017. Accordingly, any error in admitting the testimony about Ridley being in prison was harmless.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

18